**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

J M SMITH CORPORATION d/b/a SMITH
DRUG COMPANY, on behalf of itself and
all others similarly situated,

        *Plaintiff*,

v.

NOVO NORDISK INC. and NOVO
NORDISK A/S,

        *Defendants*.

Civil Action No.  1:26-cv-00420

Jury Trial Demanded

---

**CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     PARTIES ...............................................................................................................6

III.    JURISDICTION AND VENUE ..............................................................................7

IV.     REGULATORY BACKGROUND & RELEVANT MARKET DYNAMICS.................8

        A.      Brand Manufacturer NDAs and the FDA's Orange Book......................................8

        B.      Generic Manufacturer ANDAs, the Hatch-Waxman Amendments, and
                FDA Approvals...................................................................................................10

                1.      Paragraph IV ANDA Certifications, Related Patent Infringement
                        Litigation, and the Automatic Stay of FDA Approval...............................12

                2.      The 180-Day Exclusivity Award for the First-to-File ANDA with a
                        Paragraph IV Certification.........................................................................13

                3.      "Skinny Label" ANDA Carve-Outs for any Patented Method-of-
                        Use. ...........................................................................................................15

        C.      Issued Patents Are Not Absolute. ...........................................................................16

        D.      The Economics of Bioequivalent, AB-Rated Generic Drugs. ..............................16

        E.      Brand and Generic Companies Have Strong Financial Incentives to
                Unlawfully Restrain Competition. ..........................................................................17

        F.      A Delay in the First-Filer's Launch Can Be Manipulated to Delay All
                Generics. ...................................................................................................................22

V.      FACTS ...................................................................................................................23

        A.      In 2010, the FDA Approved Victoza for Diabetes. ..............................................23

        B.      Novo Flooded Its Orange Book Listings for Victoza with Ineligible
                "Bogus" and "Junk" Device Patent Listings..........................................................24

        C.      By 2017, Teva Filed Its First-Filer Victoza ANDA, Prompting Novo to
                Sue to Trigger the Automatic 30-Month Stay of FDA Generic Approval. ...........28

        D.      In March 2019, Novo Settled with an Illegal Reverse Payment to Teva that
                Unlawfully Allocated All Generic Victoza Sales to Teva for the First 180
                Days in Exchange for Teva's Agreement to: (i) Drop Its Counterclaims
                Against Novo's '833 and Wrongfully Listed Device Patents; and (ii)
                Delay Its Generic Victoza Launch Until June 2024. ............................................29

E.    In August 2019, Novo Sued the Second Victoza ANDA Filer, Mylan, Which Responded with Invalidity and Non-Infringement Counterclaims. ...........35

F.    In March 2021, Novo Induced Mylan and Pfizer to Settle to Avoid Adjudication of the '833 Patent and Thereby Preserve Novo's Parked Barrier Preventing the FDA from Approving Any Generic Victoza Before Novo's Paid-For Delayed Teva June 2024 Generic Victoza Launch. ...................38

G.    In March 2022, Novo Induced the Third Victoza ANDA Filer, Sandoz, to Settle, and, in So Doing, Confirmed Its Scheme to Avoid Adjudication of the '833 Patent and Preserve Novo's Parked Barrier Preventing the FDA from Approving Any Generic Victoza Before Teva's Delayed June 2024 Launch..................................................................................................................39

H.    After Sandoz, Novo Relied Exclusively on the '833 and Wrongfully Listed Device Patents to Commence Paragraph IV Hatch-Waxman Litigation, Trigger Automatic 30-Month Stays, and Induce Settlements with All Nine Subsequent Victoza ANDA Filers in Furtherance of Novo's Monopolization Scheme. ........................................................................................43

I.    The Current Generic Victoza Liraglutide Market as the Result of Novo's Monopolization Scheme. ....................................................................................45

J.    Absent Novo's Monopolization Scheme, Novo Could Not Have Successfully Enforced the '833 or the Device Patents to Block Generic Competition.........................................................................................................49

    1.    The '833 "For Use in Injection Devices" Patent Is Invalid and/or Not Infringed.......................................................................................50

    2.    The '893 "Injection Button" Patent Is Invalid and/or Not Infringed. ........51

K.    Absent Novo's Monopolization Scheme, Unrestrained Generic Victoza Competition Would Have Started as Early as February 23, 2023, the Day After the Exclusivity Associated with Victoza's Last Active Ingredient Patent Expired. ......................................................................................................52

VI.    CLASS ALLEGATIONS ................................................................................................57

VII.    MARKET POWER AND DEFINITION .........................................................................60

VIII.    MARKET EFFECTS AND CLASS DAMAGES ............................................................62

IX.    ANTITRUST IMPACT ...................................................................................................67

X.    EFFECT ON INTERSTATE COMMERCE ...................................................................67

XI.    CLAIM FOR RELIEF ....................................................................................................68

COUNT I: 15 U.S.C. § 2 MONOPOLIZATION AND MONOPOLISTIC
            SCHEME .............................................................................................68

XII.    DEMAND FOR RELIEF...............................................................................71

XIII.   JURY DEMAND .............................................................................................72

Plaintiff J M Smith Corporation d/b/a Smith Drug Company ("Smith Drug" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this Class Action Complaint against defendants Novo Nordisk Inc. and Novo Nordisk A/S (together "Novo" or "Defendants"), and alleges as follows based on: (a) personal knowledge, (b) the investigation of its counsel, and (c) information and belief.

## I.    INTRODUCTION

1.    This action for violations of section 2 of the Sherman Act, 15 U.S.C. § 2, arises from an overarching anticompetitive monopolization scheme by Novo to unlawfully prolong Novo's Victoza (liraglutide) monopoly and shield Victoza's first-generation GLP-1 blockbuster profits from AB-rated generic competition. This monopolization scheme substantially impaired generic competition for Victoza, and caused significant anticompetitive effects that far outweigh any procompetitive justifications for the conduct. In 2018 alone, Victoza's sales in the United States topped $5 billion.

2.    Manufactured and sold by Novo, Victoza is a branded, pre-filled, multi-dose liraglutide injection pen that is self-administered by patients as indicated to: (i) improve glycemic control in patients 10 years or older with type 2 diabetes; and (ii) reduce the risk of major adverse cardiovascular events in patients with type 2 diabetes and established cardiovascular disease.

3.    The last of Novo's active pharmaceutical ingredient patents for Victoza, U.S. Patent No. 6,268,343 (the "'343 patent"), expired on August 22, 2022, although Novo had obtained pediatric exclusivity which extended its marketing exclusivity through February 22, 2023. As such, and in the absence of the unlawful conduct challenged herein, generic Victoza would have been on the market as early as February 23, 2023, ending Novo's Victoza monopoly by that time. Indeed, the generic Victoza launch would (and eventually did) have the predictable

effect of dramatically shifting purchase volume from the expensive Victoza sold by Novo to the lower-priced generic versions sold by Teva and other generic manufacturers. With its Victoza monopoly at stake, however, Novo embarked on a monopolistic scheme to delay entry of generic Victoza and then, using the delay it bought from Teva through an illegal reverse payment, shifted prescriptions from its first generation GLP-1 drug, Victoza (liraglutide), to its second generation GLP-1 blockbuster drug, Ozempic (semaglutide), which, unlike Victoza, did not similarly face imminent threat of generic competition.

4.      Similar to Victoza, Ozempic is a self-administered GLP-1 injection indicated to: (i) improve glycemic control in adults with type 2 diabetes mellitus; (ii) reduce the risk of major adverse cardiovascular events in patients with type 2 diabetes and established cardiovascular disease; and (iii) reduce the risk of eGFR decline, end-stage kidney disease and cardiovascular death in adults with type 2 diabetes mellitus and chronic kidney disease. Novo used the delay it bought from Teva to switch prescriptions from the Victoza liraglutide market, which faced imminent generic competition that would trigger a steep Novo profit loss, to the Ozempic semaglutide market, which did not similarly face imminent generic competition.

5.      Novo's unlawful monopolization scheme included at least the following elements:

a.      Novo wrongfully listing numerous patents in the Food and Drug Administration's ("FDA") Orange Book as covering the Victoza drug substance (*i.e.*, the active pharmaceutical ingredient, liraglutide), formulation or composition, and/or method of use (*i.e.*, drug usage as indicated for the treatment of a certain disease or condition), when, in fact, such patents were instead device patents ineligible for listing in the Orange Book;

b.      Novo gaming the Hatch-Waxman regulatory process to prevent would-be generic

competition to Victoza beyond the February 22, 2023 expiration of the exclusivity associated with the '343 patent, Novo's last active ingredient patent for Victoza, by using its wrongfully listed device patents and an otherwise non-infringed and/or invalid "For Use in Injection Devices" patent, U.S. Patent No. 8,114,833 (the "'833 patent"), to, among other things, trigger Hatch-Waxman's automatic 30-month stay of FDA approval of such generics and then induce settlements that preserved and/or furthered its overall monopolization scheme;

c.  Novo's March 2019 settlement of its Paragraph IV Hatch-Waxman litigation with Teva, the first would-be generic Victoza competitor, with an unlawful reverse payment agreement actionable under *Actavis*[1] in the form of Novo's allocating to Teva all generic Victoza sales for the first 180-days following Teva's delayed launch of generic Victoza, in exchange for Teva's agreement to: (i) drop its counterclaims against Novo's '833 and wrongfully listed device patents, and (ii) delay its generic Victoza entry until at least June 24, 2024; and

d.  Novo's orchestrating the "parking" and maintenance of Teva's first-filer 180-day exclusivity as a bottleneck preventing the FDA from approving any other would-be Victoza generic competitors before the 181st day after Teva's delayed June 2024 launch, including by inducing non-first-filer Victoza ANDA applicants like Mylan Institutional LLC ("Mylan") and Sandoz Inc. ("Sandoz") to dismiss their Paragraph IV Hatch-Waxman counterclaims without adjudicating the '833 patent or any of Novo's wrongfully listed device patents, thereby preventing the court from entering any kind of invalidation or non-infringement judgment that

---

[1] *See FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) ("*Actavis*").

3

otherwise would dislodge Novo's parked barrier and empower the FDA to approve other generics before the 181st day after Teva's delayed launch.

6.    Novo's monopolization scheme had its intended anticompetitive consequence: it delayed generic competition to Victoza until June 24, 2024. That unlawful delay: (i) artificially preserved Novo's monopoly in the market for Victoza and its AB-rated generic equivalents; (ii) enabled Novo, during the delay period, to charge supracompetitive prices for Victoza; and (iii) enabled Novo to use the delay period it bought from Teva to move prescriptions from soon-to-be genericized Victoza to Novo's corresponding newer, generic-free, next-generation GLP-1 product, Ozempic. Defendants' anticompetitive conduct also unlawfully allocated to Teva all generic Victoza sales for the first 180-days following Teva's delayed launch, which enabled Teva to charge supracompetitive prices during that 180-day period.

7.    But for Novo's unlawful conduct, including its reverse payment to Teva, lower-priced generic Victoza would have launched at least as early as February 23, 2023, and certainly before the June 24, 2024 generic launch that occurred as a result of the unlawful conduct challenged herein.

8.    Novo's monopolization scheme has caused Plaintiff and Class Members to suffer overcharge damages on their purchases of brand and generic Victoza, measured by the difference between: (i) the brand and generic Victoza prices Class Members actually paid; and (ii) the lower generic Victoza prices Class Members would have paid when earlier, unrestrained generic Victoza competition would have otherwise occurred. This is because, with earlier generic Victoza entry, Class Members would have purchased lower-priced generic Victoza in place of the brand they actually purchased, and, with unrestrained generic competition starting earlier,

they would have paid lower prices for the generics they purchased since generic prices fall over time and as more generic competitors enter the market.

9.      Because Novo used the delay period it orchestrated to switch prescriptions from its first generation GLP-1 product, Victoza (liraglutide), to its second generation GLP-1 product, Ozempic (semaglutide), Plaintiff and Class Members were also overcharged on certain purchases of Ozempic because, with earlier generic Victoza entry (and less time for Novo to move Victoza sales to Ozempic), many purchases of Ozempic would instead have been purchases of less expensive generic Victoza but for Novo's monopolization scheme.

10.     Novo's monopolization scheme was designed to and did in fact: (i) delay entry of lower-priced generic Victoza; (ii) fix, raise, maintain, or stabilize the price of brand and generic Victoza; (iii) allow Novo to make Victoza and Ozempic sales that otherwise would have gone to lower-priced generic Victoza; (iv) allocate to Novo 100% of the market for Victoza and its AB-rated generic equivalents for at least 16 months; and (v) allocate to Teva 100% of the generic Victoza sales for the 180 days following Novo's paid-for delayed Teva June 2024 generic Victoza launch.

11.     Over the relevant period, Novo's monopolization scheme forced Plaintiff and Class Members to pay hundreds of millions of dollars in brand and generic overcharges that Plaintiff and Class Members would not have otherwise paid.

12.     This action seeks to recover all such overcharge damages on the direct purchases made by Plaintiff and Class Members of: (i) Victoza on or after February 23, 2023, up through the present, and up to the day the anticompetitive effects of Novo's monopolization scheme have ceased; (ii) generic Victoza on or after June 24, 2024, up through the day the anticompetitive effects of Novo's monopolization scheme have ceased; and (iii) Ozempic on or after February

23, 2023, up through the present, and up to the day the anticompetitive effects of Novo's monopolization scheme have ceased, that, but for the anticompetitive conduct that delayed generic Victoza's launch challenged herein, would have instead been purchases of lower-priced generic Victoza in the ordinary course.

## II.     PARTIES

13.     Plaintiff J M Smith Corporation d/b/a Smith Drug Company ("Smith Drug") is a South Carolina company with its principal place of business located in Spartanburg, South Carolina. At all relevant times Smith Drug purchased Victoza and Ozempic directly from Novo and generic Victoza directly from Teva, at supracompetitive prices, and therefore suffered antitrust injury as a result of the unlawful conduct alleged herein.

14.     Defendant Novo Nordisk Inc. is a Delaware corporation with its principal place of business in Plainsboro, New Jersey, registered to conduct business in the State of New York (DOS ID 3636584). Novo Nordisk Inc. is the holder of the Victoza NDA.

15.     Novo Nordisk, Inc.'s parent company, Defendant Novo Nordisk A/S is organized and headquartered in Denmark. Novo Nordisk A/S is the owner and/or licensee of all of the Victoza patents at issue in this case.

16.     Novo Nordisk A/S identifies Novo Nordisk, Inc. as its authorized agent in the United States.

17.     Novo Nordisk Inc. and Novo Nordisk A/S either directly or through one or more of their agents, developed and manufacture Victoza, which Novo markets, distributes, and sells throughout the United States.

18.     Together, Novo Nordisk Inc. and Novo Nordisk A/S jointly filed Hatch-Waxman litigation against would-be generic competitors of Victoza in furtherance of the unlawful monopolization scheme alleged herein.

19.     All of the actions described in this complaint are part of, and in furtherance of, the unlawful conduct alleged herein and were authorized, ordered, or undertaken by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs and within the course and scope of their duties and employment or with Defendants' actual, apparent, or ostensible authority.

### III.     JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1331, 1337(a) and 15 U.S.C. § 15.

21.     This action arises under section 2 of the Sherman Act (15 U.S.C. § 2), violations of which are made privately actionable through section 4 of the Clayton Act (15 U.S.C. § 15(a)), and seeks threefold damages, costs of suit, and reasonable attorneys' fees for the overcharges paid by Plaintiff and Members of the proposed Class resulting from Novo's overarching monopolization scheme to monopolize the Victoza market.

22.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and 15 U.S.C. § 15.

23.     Defendants transact business within this district and carry out interstate trade and commerce in substantial part in this district and/or have agents and/or can be found in this district. Venue is therefore appropriate within this district under section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. §1391(b) and (c).

24.     The Court has personal jurisdiction over each Defendant. Defendants have transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the monopolization scheme throughout the United States, including in this District. The monopolization scheme has been directed at, and has had the intended effect of, causing injury to

persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.    REGULATORY BACKGROUND & RELEVANT MARKET DYNAMICS

### A.    Brand Manufacturer NDAs and the FDA's Orange Book.

25.    Under the Food, Drug, and Cosmetics Act ("FDCA"), drug companies looking to sell a new drug product in the United States must file a New Drug Application ("NDA") with the FDA. An NDA submission must include specific data concerning the safety and efficacy of the proposed drug.

26.    Under the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Amendments"), Pub. Law No. 98-417, 98 Stat. 1585 (1984), an NDA applicant must submit to the FDA information on each patent that claims "the drug" or "a method of using such drug" described in the NDA and for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner . . . engaged in the manufacture, use, or sale of the drug." 21 U.S.C. §§ 355(b)(1), (c)(2). The FDA then publishes this information in a digest titled *Approved Drug Products with Therapeutic Equivalence Evaluations*, commonly known as the Orange Book.

27.    The FDA does not police the listing of patents or other material in the Orange Book. The FDA performs only a ministerial act in listing in the Orange Book the patents a brand manufacturer submits. Thus, the FDA relies completely on the brand manufacturer's truthfulness in the Orange Book information it supplies, including whether the listed patent claims the drug or a method of using the drug that is the subject of the NDA.

28.    Federal regulations impose strict limitations on the types of patents that an NDA holder can submit to the FDA for listing in the Orange Book. The only patents that can be submitted "consist of drug substance (ingredient) patents, drug product (formulation and

composition) patents, and method of use patents. * * * For patents that claim a drug substance or drug product, the applicant shall submit information only on those patents that claim a drug product that is the subject of a pending or approved application, or that claim a drug substance that is a component of such a product. For patents that claim a method of use, the applicant shall submit information only on those patents that claim indications or other conditions of use of a pending or approved application." 21 C.F.R. § 314.53(b).

29.     Applicable regulations also emphasize the obligation by brand manufacturers to be honest and truthful in their Orange Book submissions, by requiring, among other things, that brand manufacturers submit a signed verification under penalty of perjury attesting that such Orange Book listing submission "is an accurate and complete submission of patent information [that] complies with the [listing] requirements" – *i.e.*, that the listing submission concerns a patent that claims the "drug substance (active ingredient)," the "drug product (formulation and composition)" or the drug's "method-of-use." 21 C.F.R. §§ 314.53(b)(1) & (c).

30.     The listing of a patent in the Orange Book triggers various regulatory consequences. Among these consequences: a would-be generic drug manufacturer is obligated to respond to each such Orange Book-listed patent in one of a limited number of ways, discussed further below. In turn, these required responses can enable the brand NDA holder to initiate Hatch-Waxman litigation and thereby trigger the Hatch-Waxman automatic stay of the FDA's ability to approve the generic for up to 30-months. Hence, even wrongful patent listings can have drastic anticompetitive consequences.

31.     Drug delivery device patents do not qualify for listing in the Orange Book. *In re Lantus Direct Purchaser Antitrust Litig.*, 950 F.3d 1, 10 (1st Cir. 2020).

32.     The listing of device patents in the Orange Book is an anticompetitive abuse of

the Hatch-Waxman regulatory regime. *See, e.g.*, FTC Statement Concerning Brand Drug Manufacturers' Improper Listing of Patents in the Orange Book (Sept. 14, 2023) at 2, available at https://www.ftc.gov/legal-library/browse/policy-statements.

**B.    Generic Manufacturer ANDAs, the Hatch-Waxman Amendments, and FDA Approvals.**

33.    Congress passed the Hatch-Waxman Amendments to balance the need to provide brand companies with incentives to develop new medicines against the countervailing need to speed the entry of lower-priced generic versions of these medications.

34.    The Hatch-Waxman Amendments enable a generic manufacturer to file an Abbreviated New Drug Application ("ANDA") with the FDA for a drug it seeks to bring to market as a lower-priced substitute for its corresponding brand (sometimes referred to as the "reference-listed drug" ("RLD") or "reference product"). Rather than requiring generic manufacturers to conduct expensive clinical trials to re-prove the drug's safety and efficacy, the Hatch-Waxman Amendments allow generic manufacturers to rely on the RLD's data the brand had already submitted to prove the drug's safety and efficacy. Instead, a generic manufacturer must show that its generic formulation is pharmaceutically equivalent and bioequivalent to the brand. The premise – codified by Congress and implemented by the FDA for the past forty years – is that two drug products that contain the same active pharmaceutical ingredient ("API") in the same dose with the same method of administration that are absorbed by the human body in the same way are equally safe and effective.

35.     In practical terms, this means that an ANDA applicant must show that the generic drug product described in the ANDA is substantially "the same as" the brand drug[2]; that is, that the generic product contains the same API, route of administration, dosage form, strength, rate and extent of absorption (bioequivalence), at least one of the same conditions of use, and, with certain permissible differences, substantially the same labeling as the brand RLD.[3] Having done so, the ANDA applicant may rely on the FDA's previous finding that the brand drug product is safe and effective because—as a matter of science and decades of experience—there is no reason to believe that the generic product would behave any differently in the body. If a generic application meets those criteria relative to its brand counterpart, the FDA assigns the generic drug an "AB" rating. An AB-rating means that the FDA has determined that the generic is equally as safe and effective as its RLD and therefore can be freely substituted for the brand.

36.     The Hatch-Waxman Amendments also provide the framework through which a generic manufacturer must address each patent the NDA holder listed in the Orange Book as covering its brand drug. To obtain FDA approval of its ANDA, a generic manufacturer must, with respect to each Orange-Book listed patent, either (i) provide one of the four below-listed certifications, or (ii) agree to carve out from its label the method-of-use claimed in such patent.

37.     If not addressed with a label carve out, the ANDA must include one of the following four certifications with respect to each patent the brand manufacturer listed in the Orange Book as covering its brand drug (21 U.S.C. § 355(j)(2)(A)(vii)(I)-(IV); 21 C.F.R. § 314.94(a)(12)(i)(A)):

---

[2] *See* 21 U.S.C. § 355(j)(2)(A) (2008) (the same active ingredient(s), route of administration, dosage form, strength, rate and extent of absorption (bioequivalence), at least one same condition of use, and similar labeling).

[3] *Id.* § 355(j)(2)(A)(iv); *see also* 21 C.F.R. 314.94(a)(7).

(I)     that such patent information has not been filed (a "Paragraph I certification");

(II)    that such patent has expired (a "Paragraph II certification");

(III)   that the generic applicant does not seek to market its generic version of the reference-listed drug until the date on which such patent will expire (a "Paragraph III certification"); or

(IV)    that the generic applicant seeks to market its generic version of the reference-listed drug before the expiration date of the patent, but that such patent is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the generic drug for which the application is submitted (a "Paragraph IV certification").

**1.      Paragraph IV ANDA Certifications, Related Patent Infringement Litigation, and the Automatic Stay of FDA Approval.**

38.     If an ANDA applicant wishes to market its generic product for any approved FDA indication prior to the expiration date of a brand's Orange-Book listed patent (that is not subject to a label carve out), the ANDA applicant must file a Paragraph IV certification. The applicant must then provide the NDA holder and the patent owner notice of its Paragraph IV certification. This notice must include a detailed description of the legal and factual bases for the ANDA holder's assertion that the patent is invalid, not infringed by the ANDA product, or is otherwise unenforceable. 21 U.S.C. § 355(j)(2)(B)(iv)(II).

39.     The filing of a Paragraph IV certification then supplies standing for the NDA holder to initiate patent litigation against the ANDA applicant, and, if the NDA holder files a patent infringement action against the ANDA filer within 45 days of receiving that ANDA applicant's Paragraph IV notice, that lawsuit will automatically trigger a stay of the FDA's ability to grant final approval to the ANDA for up to 30 months from the date of receipt of the

Paragraph IV notice. 21 U.S.C. § 355(j)(5)(B)(iii).

40.    Hence, the listing of even an invalid, unenforceable, or ineligible-for-listing patent in the Orange Book affords the NDA holder a powerful tool to delay generic competition for up to 30 months.

### 2.    The 180-Day Exclusivity Award for the First-to-File ANDA with a Paragraph IV Certification.

41.    The first generic manufacturer to file a Paragraph IV-certified ANDA is eligible to obtain 180 days of market exclusivity. This means that subsequent ANDA applicants cannot be approved by the FDA until after the first-filer's 180-day exclusivity has been triggered and elapsed, or has been forfeited. 21 U.S.C. §§ 355(j)(5)(B)(iv), (5)(D).

42.    This 180-day exclusivity period is very valuable to generic manufacturers. The Supreme Court has observed that "the vast majority of potential profits for a generic drug manufacturer materialize during the 180-day exclusivity period." *Actavis*, 570 U.S. at 144.

43.    The first-filer 180-day exclusivity period, however, does not prevent the brand from marketing its own generic through its FDA-approved NDA. This type of generic is typically referred to as an "authorized generic" or "AG." An AG can be launched either by the brand manufacturer or its licensee(s) at any time, including at the start of, or at any time during, an ANDA first-filer's 180-day exclusivity period.[4]

44.    The first-filed ANDA applicant triggers the running of its 180-day exclusivity period the moment that applicant starts to sell either: (i) the generic product described by its ANDA and approved by the FDA; or (ii) an authorized generic. The first-filer's 180-day

---

[4] Because an AG is identical to the brand RLD (aside from its labeling and trade dress), it does not technically require an AB-rating for purposes of being automatically substituted for the RLD. Since an AG *is* the brand drug itself (just in a different trade dress) it can be automatically substituted for the RLD just like an AB-rated generic.

exclusivity will elapse 180 days later, allowing the FDA to thereafter approve any later-filed ANDA for launch starting as early as day 181.

45.    The first-filer's 180-day exclusivity may be forfeited under certain conditions, such as the withdrawal of the RLD's Orange Book-listed patent, or a final judgment entered by a court that said patent is invalid or not infringed by the ANDA applicant's proposed product. But a first-filer's 180-day exclusivity cannot be forfeited if an unexpired patent submitted to the FDA for listing in the Orange Book by the NDA holder has not been adjudicated in a court judgment as either invalid or not infringed. Thus, if the NDA holder can induce the first-filer to keep its 180-day exclusivity "parked" (by agreeing to settle the Paragraph IV litigation and delay its generic launch) and thereby prevent the FDA from approving any later-filed ANDA, listing patents in the Orange Book — even ones that are not qualified for listing — affords the NDA holder a powerful tool to delay competition beyond the automatic 30-month stay.

46.    Pursuant to policy and practice, the FDA does not resolve 180-day exclusivity forfeiture questions unless and until it has to. This means that the FDA typically will not make a forfeiture determination unless a subsequent ANDA may become eligible for approval because, for instance, a court has issued the required judgment of invalidity or non-infringement of the at-issue blocking patent(s).[5] A stipulated dismissal of related Paragraph IV Hatch-Waxman litigation cannot trigger forfeiture. Hence, insofar as the NDA holder can induce later-filed ANDA holders to dismiss their related Paragraph IV Hatch-Waxman litigation without an adjudication of the at-issue patent(s), including by providing the later ANDA filer with a covenant not to sue on such patent(s), the NDA holder can continue to preserve the first-filer's parked exclusivity to block the FDA from approving any non-first-filer ANDAs. Such dismissals

---

[5] 21 U.S.C. § 355(j)(5)(D)(i)(I).

also preserve the at-issue blocking patent for the NDA holder to again wield against other, later ANDA applicants.

       **3.**      **"Skinny Label" ANDA Carve-Outs for any Patented Method-of-Use.**

    47.    Section 505(j)(2)(A)(i) of the FDCA requires that an ANDA contain "information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new [generic] drug have been previously approved for [the brand RLD]." This language reflects Congress' intent that the generic drug be safe and effective for each "condition of use" prescribed, recommended, or suggested in the generic drug labeling. But it does not require that an ANDA be approved for each and every condition of use for which the brand RLD is approved. Thus, in 21 C.F.R. § 314.92(a)(l), the FDA has explicitly stated that a proposed ANDA generic must have the same conditions of use as the listed drug *except* those "conditions of use for which approval cannot be granted because of exclusivity or an existing patent may be omitted."

    48.    The FDCA therefore allows a generic product to have a different drug label than the brand for "differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity under section 505(j)(5)(F)." 21 C.F.R. § 314.94(a)(8)(iv).

    49.    An ANDA applicant thus has the option of seeking FDA approval to market its generic product pursuant to a "skinny label" that carves out from the generic's usage any method-of-use covered by any of the brand'**s** follow-on patents so as to permit that generic to reach the patient population(s) for the methods-of-use covered by any already expired patents. To do so, the ANDA applicant simply submits a "section viii" statement (often referred to as a "little viii" statement) pursuant to Section 505(j)(2)(A)(viii) of the FDCA, and then proposes to

the FDA labeling for its generic product that "carves out" from its label the still-patented methods of use covered by the brand RLD's label. The FDA may then approve the generic on the condition of the modified "skinny" use label. 21 C.F.R. § 314.127(a)(7).

**C.    Issued Patents Are Not Absolute.**

50.    The existence of one or more patents purporting to cover a drug product does not guarantee a brand drug company a monopoly over the drug. Patents are routinely invalidated, or held unenforceable, and/or not infringed.

51.    As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely than not that a challenged patent will be found invalid or not infringed rather than upheld. The Federal Trade Commission ("FTC") reported that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002, and a similar empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly concluded that when a generic challenger stays the course until a decision on the merits, the generic prevails 74% of the time.[6]

**D.    The Economics of Bioequivalent, AB-Rated Generic Drugs.**

52.    Because bioequivalent and pharmaceutically equivalent (*i.e.*, AB-rated) generic versions of brand-name drugs contain the same API and are determined by the FDA to be just as safe and effective as their branded counterparts, the only material differences between generic drugs and their branded counterparts are their prices and manufacturers. Because generic versions of branded products are commodities that cannot be differentiated, the primary basis for

---

[6] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 TEX. L. REV. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago.).

generic competition is price.

53.    Typically, when there is a single generic competitor, the average generic price at launch is roughly 30% less than the price of the brand. Generics are 50% to 80% (and sometimes even more) less expensive when there are multiple generic competitors on the market for a given brand. And, once the generic launches, the price of the generic decreases over time towards commodity pricing, regardless of the number of generic competitors. Generic purchases rapidly replace brand purchases as a result of this price difference. Consequently, the launch of a bioequivalent generic drug usually results in significant cost savings to all drug purchasers and a precipitous loss in profits to the maker of the brand drug.

54.    Since the passage of the Hatch-Waxman Amendments, every state has adopted substitution laws that either require or permit the substitution of AB-rated generic equivalents for brand prescriptions.

55.    Several factors — the regulatory interchangeability of bioequivalent AB-rated generics for the brand, state substitution laws, margin incentives of pharmacies, managed care preference for generic drugs — result in the typical phenomenon that once a brand drug "goes generic," the drug swiftly moves from a monopoly-priced to a commodity-priced item.

56.    Generic competition enables all members in the chain of distribution, including all direct purchasers and patients, to purchase generic versions of the drug at substantially lower prices.

**E.    Brand and Generic Companies Have Strong Financial Incentives to Unlawfully Restrain Competition.**

57.    Until a generic version of the brand drug enters the market, there is no bioequivalent drug to substitute for and compete with the brand drug, and therefore the brand manufacturer can continue to charge supracompetitive prices.

58.    Brand manufacturers such as Novo are well aware that generics rapidly erode their brand sales. Brand manufacturers thus seek to extend their monopolies through any means possible, sometimes resorting to illegal means.

59.    One way that brand manufacturers game the system to anticompetitive effect is by paying generic manufacturers to delay entering the market. These agreements not to compete are sometimes referred to as "reverse payment agreements," "exclusion payment agreements," or "pay-for-delay agreements," which have long concerned the FTC. Brand and generic manufacturers execute reverse payment agreements to take advantage of the regulatory consequences associated with the generic manufacturers' Paragraph IV certifications.

60.    In the prototypical reverse payment agreement, the brand manufacturer pays the generic manufacturer to delay its market entry. The brand manufacturer preserves its monopoly by effectively paying some of its monopoly profits to the generic manufacturer, which, in turn, agrees to delay the marketing of its generic product. Often the payment made by the brand manufacturer, though a small percentage of its (unlawful) monopoly brand revenues, overwhelms the (would-be lawful) revenues the generic manufacturer would otherwise anticipate from its early generic sales. So, from both the brand and generic manufacturers' perspectives, these reverse payments are seen as win-win, but lose-lose for Plaintiff, Class Members, and consumers.

61.    One type of brand-to-generic payment for delay comes in the form of the brand company's promise to not launch its competing second generic or AG during the first-filer generic's 180-day exclusivity period. As discussed above, an AG is the brand drug sold by the brand or the brand's licensee as a generic under the brand's FDA-approved NDA (as opposed to a competing generic's ANDA). Because the brand manufacturer already has approval to sell its

brand drug through its NDA, it does not need to file an ANDA or obtain any additional approval to market an authorized generic through its NDA. And, that AG can be launched at any time, including at any time before or during the ANDA first-filer's 180-day exclusivity period.[7]

62.    For the brand company, launching an authorized generic on the first day that a competing ANDA generic launches (or at any time during the ANDA first-filer's 180-day exclusivity period) provides a low-cost, low-risk means to regain or retain some of the revenue that it would otherwise lose to and fuel its generic competitor(s).

63.    The FTC reported to Congress in 2011 that brand firms facing generic entry on molecules with annual sales of at least $500 million typically launch an AG during the first-filer's 180-day exclusivity period 80% of the time (19 of the 24 instances reported in the FTC's study).[8] The larger the brand's annual revenues, the stronger the brand's incentive to launch an AG.[9]

64.    Accordingly, for blockbuster-revenue brand drugs like Victoza (which, in 2018, had over $5 billion in U.S. sales), market participants would typically expect two generic versions available during the first-filer's 180-day exclusivity period: the generic version sold under the first-filer's ANDA, and an authorized generic version sold under the brand's NDA.

---

[7] An AG launch is typically only ever precipitated by the onset of third-party generic competition. Without another generic competitor in the market, the launch of an AG would result in the brand company's sacrifice of its high-revenue brand sales in favor of its lower-priced generic sales, an economically irrational outcome. Hence, brand manufacturers typically wait until the very last moment to launch an AG, usually the first day the first generic competitor launches.

[8] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* at 26-30 & Fig. 2-9 (Aug. 2011) (the "2011 FTC Report to Congress").

[9] In holding that a no-AG agreement could constitute an unlawful reverse payment under *Actavis*, the Third Circuit observed: "Absent a no-AG promise, launching an authorized generic would seem to be economically rational for the brand." *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.,* 791 F.3d 388, 405 (3d Cir. 2015).

65.     Indeed, Teva would have expected that if it launched generic Victoza under its ANDA, Novo would launch its own AG under its NDA. For example, in a 2004 earnings conference call, Teva's President and CEO said that "We now factor authorized generics into our plans as a given."[10]

66.     However, the brand's launch of the second generic (*i.e.*, an AG) during the first-filer's 180-day exclusivity has a huge negative impact on the first-filer's revenue. A first-filer generally earns about 80% of its total income from a given generic product during its 180-day exclusivity period. If a brand company launches a second generic (under its NDA) during that 180-day period, that second generic will capture 50% or more of total generic unit sales during that period, and will cause generic prices to decrease as a result of the price competition. A brand company's promise not to launch a competing generic during the first-filer's 180-day exclusivity period is thus a very valuable payment to the ANDA first-filer, effectively doubling the first-filer's generic unit sales and more than doubling its revenues and profits (by removing the would-be generic price competition). Correspondingly, a brand company's promise not to launch a second generic represents a substantial sacrifice of the revenues and profits for the brand that the brand company would have otherwise earned. Those revenues and profits are instead ceded, by way of the no-authorized generic promise (or comparable agreement), to the first-filer generic, who has no right to be free from competition from an authorized generic.

67.     Hence, the brand's promise not to compete with an AG during the first-filer's 180-day exclusivity period (or comparable agreement) can transfer significant value to the generic manufacturer. In the absence of such competition, the first-filer generic is assured 100% of all generic sales for those 180 days, and during that time can charge much higher generic

---

[10] Q3 2004 Teva Pharmaceutical Earnings Conference Call held on November 4, 2004.

prices than it otherwise would (*i.e.*, because it otherwise would have to compete for sales with the brand's second generic).

68.     In its 2011 report to Congress, the FTC concluded that no-AG promises were being used as a payment by brands to generics for delayed generic entry: "there is strong evidence that agreements not to compete with an authorized generic have become a way for brand-name companies to compensate generic competitors for delaying entry."[11]

69.     For a first-filer such as Teva preparing to market a generic version of a brand product like Victoza, the difference between (1) selling the only generic product for six months, and (2) selling a generic product while competing against a second generic (*i.e.*, an AG) for the first six months of generic marketing, is substantial, and worth hundreds of millions of dollars. These economic realities are well-known in the pharmaceutical industry, and the 2011 FTC Report to Congress report cites numerous documents from industry participants confirming the financial impact of an authorized generic and, by necessary implication, its absence.

70.     A promise by the brand to allocate all generic sales to its generic competitor in exchange for a promise by the generic company to delay its generic launch is an agreement between horizontal competitors that unjustly enriches both companies and injures consumers twice over: first, it prolongs the period during which only the high-priced brand is available; and second, it ensures that, even after delayed generic competition begins, generic prices are artificially inflated by the absence of a second generic competitor. In addition, a no-AG (or comparable) agreement gifts a generic competitor a valuable "first mover" advantage — *i.e.*, it allows the generic competitor to obtain customers during the 180-day exclusivity period before

---

[11] 2011 FTC Report to Congress at vi.

any other generic competitor, an advantage that results in the "first mover" retaining a higher share of generic sales than it otherwise would once additional generic competitors launch.

**F.    A Delay in the First-Filer's Launch Can Be Manipulated to Delay All Generics.**

71.    As noted above, absent the first-filer's relinquishment or forfeiture of its 180-day exclusivity, the FDA cannot approve any later-filed ANDA until the first-filer's 180-day exclusivity has run. To obtain forfeiture, the later-filed ANDA holder needs to obtain a court judgment adjudicating the invalidity or noninfringement of the patent that is (or the patents that are) the basis for the first-filer's 180-day exclusivity.

72.    Hence, a brand manufacturer has the ability not only to delay the FDA from approving any later-filed ANDAs merely by inducing the first-filer to delay its launch, but can prolong that ability so long as it can cajole the later ANDA filer(s) to resolve the brand's Paragraph IV Hatch-Waxman suits without adjudicating to a judgment the underlying patent(s) supporting the first-filer's 180-day exclusivity.

73.    Though all generic manufacturers are racing to be among the first to market and thereby take advantage of the higher pricing that exists in the earliest stages of the generic market's formation when the number of generic competitors is fewest and generic pricing is at its most profitable, a later ANDA filer generally has more modest financial prospects than the first-filer.

74.    For example, in the absence of potential first-filer forfeiture, a later ANDA filer does not typically have an expectation of market exclusivity. Instead, the later filer typically works to obtain FDA approval in time to launch on the day immediately following the expiration of the first-filer's 180-day exclusivity (*i.e.*, on the 181st day after the first-filer launch), expecting competition from, at least, the first-filer and an authorized generic, if not also from other FDA-approved later-filed ANDA generics launching on or about day 181.

75.    In circumstances where the first-filer has already settled its Paragraph IV Hatch-Waxman litigation with a published agreed-upon generic entry date, later ANDA filers may be subject to an automatic 30-month stay that runs up to or well after that first-filer's agreed-upon entry date. Under those circumstances, no such later ANDA filer would have the economic incentive to expend the resources necessary to take its Paragraph IV Hatch-Waxman litigation all the way to the patent judgments that are necessary for first-filer forfeiture, when its only reward would be the entry of all the other ANDA filers that also attain FDA approval (and likely without any of the added litigation expense). In such circumstances, the later ANDA filer is unlikely to recoup its would-be litigation expense by competing.

76.    Delay agreements with the first-filer and related conduct that maintains the first-filer's exclusivity as a barrier to the FDA's approval of any other generic have disincentivizing anticompetitive market effects and are contrary to the goals of the Hatch-Waxman statutory scheme. As with other gaming tactics brand manufacturers can deploy to delay generic entry, these FDA-approval bottlenecking schemes artificially prolong the brand manufacturer's monopoly profits and delay consumer access to lower-cost generics, while forcing Plaintiff and Class Members to pay artificially higher prices as a result.

## V.    FACTS

### A.    In 2010, the FDA Approved Victoza for Diabetes.

77.    In March 2008, Novo submitted its Victoza NDA (NDA #022341), which the FDA approved on January 25, 2010 as a "Type 1 - New Molecular Entity" for the following indication: "as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes." By August 2017, the FDA approved Novo's supplemental application (sNDA #027) for the following additional indication: "to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes . . . and established cardiovascular disease." By June 2019,

upon Novo's completion of related pediatric clinical study, the FDA approved Victoza's expanded usage to "patients with type 2 diabetes . . . 10 years and older."

78.     Victoza is taken daily by subcutaneous self-injection via an injection pen containing 18 mg of liraglutide that dispenses doses of 0.6 mg, 1.2 mg, or 1.8 mg, with a 1.8 mg maximum dose.

79.     The pen device used with Victoza was not developed specifically for dispensing Victoza but was instead a slightly modified version of a pre-existing, already-approved pen device.

80.     By the time the FDA approved Victoza in 2010, its weight loss side-effects had been clinically documented and were well-known. This no doubt fueled Victoza's immediate commercial success. By 2012, its annual U.S. sales surpassed $1 billion.

**B.    Novo Flooded Its Orange Book Listings for Victoza with Ineligible "Bogus" and "Junk" Device Patent Listings.**

81.     When Novo obtained FDA approval for Victoza in 2010, it properly submitted for listing in the Orange Book the following drug derivative, formulation, and method-of-use patents for Victoza: U.S. Patent Nos. 6,268,343, 6,458,924, and 7,235,627, all three of which were entitled, "Derivatives of GLP-1 Analogs," and U.S. Patent No. 8,846,618, which was entitled, "Stable Formulation of Modified GLP-1." These properly listed patents, however, were set to expire starting in 2017.

82.     The latest expiring of these four patents, the '343 patent, was set to expire on August 22, 2022. With the addition of the six-month pediatric exclusivity awarded to Novo in May 2019, the exclusivity associated with the '343 patent expired on February 22, 2023.

83.     Novo itself understood, as it explained to shareholders in 2021, that this '343 patent was the last of its "active ingredient" patents, and that the February 2023 expiry date for

the exclusivity associated with the '343 patent represented the expiry date for the last of its patents covering the Victoza "product."

84.    Thus, based on these properly listed patents, Novo expected generic competition to Victoza would start on or about February 23, 2023, the day after all exclusivities associated with the '343 patent expired.[12]

85.    But Novo wanted more time so that it could continue to harvest its monopoly profits, even if it meant resorting to illegal means to extend its market exclusivity. And, to do that, it only needed to list additional patents with later expiry dates in the Orange Book for Victoza, notwithstanding their ineligibility for such listing. Even if ineligible for listing or unable to prevent generic launch on the merits, such patents can nevertheless trigger various Hatch-Waxman consequences which Novo could (and did) manipulate to delay generic entry beyond February 22, 2023.

86.    The FDA does not police Orange Book listings. Hence, any additional, later-expiring patent Novo listed in the Orange Book for Victoza, regardless of merit, applicability, or eligibility would force a response from any would-be generic competitor.

87.    No matter how inappropriate the patent is for Orange Book listing, if a competitor wanted to market its generic before the expiration of any wrongly-listed additional patents (a virtually certain outcome, given that legitimate exclusivity would expire no later than February 22, 2023), that competitor needed to serve Novo with a notice of a Paragraph IV Certification as

---

[12] In 2018, Novo obtained and listed in the Orange Book for Victoza U.S. Patent No. 9,968,659 (the "'659 patent"), which is entitled "Liraglutide in Cardiovascular Conditions" and has a 2037 expiry date. This '659 patent, however, was not a patent that would block generic ANDA approvals but instead a method-of-use patent that, as the FDA's December 2024 final approval of Hikma's Victoza ANDA confirms, could easily be carved out by a little viii statement.

to any such additional patent. That notice would then provide Novo with: (i) the power to file

Hatch-Waxman litigation to trigger the automatic stay of FDA approval of such generic for up to

30 months; (ii) the time and opportunity to devise still other ways to further delay generic

competition; and (iii) the time and opportunity to further erode the Victoza market by shifting

prescriptions to Ozempic.

88.     Accordingly, between 2012 and 2019, Novo added to its Victoza Orange Book

listing the otherwise non-infringed and/or invalid '833 patent and six ineligible device patents.

Four of these added patents had expiry dates beyond February 22, 2023, with one of these device

patents having an expiry date as far out as 2033. **Table 1** below identifies all seven of these

additional patents Novo listed in the Orange Book for Victoza, including all six device patents

(in order of expiry, including any added pediatric exclusivity and with Novo's device patents

noted in red and bold type).

**TABLE 1**

| Patent No. | Patent Title | Issue Date | Expiry |
|---|---|---|---|
| 6,004,297 | Injection Syringe | 12/12/1999 | 1/28/2019 |
| RE 43,834 | Injection Syringe | 11/27/2012 | 1/28/2019 |
| RE 41,956 | Dose Setting Limiter | 11/23/2010 | 7/21/2021 |
| 8,579,869 | Needle Mounting System and a Method for Mounting a Needle Assembly | 11/12/2013 | 12/30/2023 |
| 7,762,994 | Needle Mounting System and a Method for Mounting a Needle Assembly | 7/27/2010 | 11/23/2024 |
| 8,114,833 | Propylene Glycol-Containing Peptide Formulations Which Are Optimal for Production and For Use in Injection Devices | 2/14/2012 | 2/13/2026 |
| 9,265,893 | Injection Button | 2/23/2016 | 3/23/2033 |

89.     Notably, only one of the seven patents Novo added for Victoza even mentions the

product's "formulations" in its title: the '833 patent. Entitled, "Propylene Glycol-Containing

Peptide Formulations Which Are Optimal for Production and For Use in Injection Devices," the

'833 patent has a February 13, 2026 expiry date. Novo relied on both the '833 patent and its

wrongfully listed device patents to institute and maintain its monopolization scheme to delay generic competition to Victoza beyond the February 22, 2023 expiry of the '343 patent – *i.e.*, the last of the products' "active ingredient" patents. However, the '833 patent was invalid, not infringed, and/or otherwise would not have been a barrier to generic entry. Absent Novo's inducements and other maneuvers discussed below, the '833 patent would not have blocked generic competition.

90.     In 2023, the FTC specifically identified the listing of device patents in the Orange Book as an especially pernicious anticompetitive abuse of the Hatch-Waxman regulatory regime, if not outright "illegal monopolization" that needed to immediately stop. The FTC expressly put the entire industry on notice that it would scrutinize the Orange Book listings for such improperly listed patents. It urged NDA holders to vet their Orange Book listings to ensure only qualified patents were listed and to "immediately remove any patents that fail to meet the listing requirements." Novo did nothing.

91.     By April 30, 2024, the FTC specifically identified Novo as among the worst offenders, citing Novo's device patent listings for Victoza as egregious. The FTC described Novo's Orange Book listings for Victoza as nothing but "junk" and "bogus," and gave Novo 30 days to clean up its act and remove its improper device patent listings.

92.     Novo at first refused. But, by 2024, Novo had already benefitted from its monopolization scheme. It had already relied on the otherwise non-infringed and/or invalid '833 patent and its wrongfully listed device patents to prompt Paragraph IV Hatch-Waxman litigation, trigger automatic 30-month-stays, and thereafter induce settlements from 12 would-be generic Victoza competitors, and, in so doing, had already delayed generic competition through June 22, 2024, banking another $3-$4 billion in Victoza U.S. sales. Novo therefore eventually delisted all

of its device patents for Victoza, but maintained the '833 patent.[13] However, and as noted above, this '833 patent was invalid and/or not infringed and, as discussed below, in the absence of Novo's monopolization scheme would not have blocked generic competition.

**C.    By 2017, Teva Filed Its First-Filer Victoza ANDA, Prompting Novo to Sue to Trigger the Automatic 30-Month Stay of FDA Generic Approval.**

93.    In January 2017, Teva served Novo with notice of its Paragraph IV-certified Victoza ANDA. Teva had, by then, already filed its ANDA, certifying, under oath to the FDA, that the applicable patents Novo listed in the Orange Book for Victoza were invalid, unenforceable, or would not be infringed by Teva's Victoza ANDA product.

94.    On the basis of Teva's Paragraph IV notice, Novo filed Hatch-Waxman litigation against Teva in the District of Delaware on March 3, 2017. *See Novo Nordisk Inc. v. Teva Pharmaceuticals USA, Inc.*, 17-cv-227 (D. Del.). Novo's suit triggered the automatic stay, which instantly prevented the FDA from approving Teva's generic for up to 30 months.

95.    As shown in **Table 2** below, in its complaint Novo asserted against Teva the following Orange Book-listed patents (in order of expiry, and with Novo's device related patents noted in red and bold type):

**TABLE 2**

| Patent No. | Patent Title | Issue Date | Expiry Date |
|---|---|---|---|
| **RE41,956** | **Dose Setting Limiter** | **11/23/2010** | **1/21/2021** |
| 8,846,618 | Stable Formulation of Modified GLP-1 | 9/30/2014 | 6/27/2022 |
| 6,268,343 | Derivatives of GLP-1 Analogs | 7/31/2001 | 8/22/2022[14] |

---

[13] The only other Orange Book-listed patent for Victoza that Novo maintained was the '659 "Liraglutide in Cardiovascular Conditions" patent. But as previously noted, this non-device method-of-use patent could be easily carved out via a little viii statement, and therefore could not be relied on by Novo as a block to generic competition.

[14] After the litigation, the FDA awarded Novo six months pediatric exclusivity which extended the exclusivity associated with the '343 patent to February 22, 2023.

| Patent No. | Patent Title | Issue Date | Expiry Date |
|---|---|---|---|
| 8,114,833 | Propylene Glycol-Containing Peptide Formulations Which Are Optimal for Production and For Use in Injection Devices | 2/14/2012 | 8/13/2025 |
| 9,265,893 | Injection Button | 2/23/2016 | 9/23/2032 |

96.     Teva counterclaimed for a declaration that all five patents were invalid and/or not infringed.

97.     In 2019, the parties held their final pre-trial conference, during which the district court instructed the parties to narrow the issues to be tried. At that point, Teva stipulated to infringement of the '618 and '343 non-device, active ingredient patents, both of which expired by February 22, 2023.

98.     In the final joint pretrial order, Teva identified the extensive evidence demonstrating that, among other things, the '833 patent was invalid as obvious or anticipated by prior art (and not infringed in any event), and that its pen device for generic Victoza could not infringe Novo's otherwise invalid '893 "Injection Button" patent because Teva's device did not have an injection button.[15]

**D.     In March 2019, Novo Settled with an Illegal Reverse Payment to Teva that Unlawfully Allocated All Generic Victoza Sales to Teva for the First 180 Days in Exchange for Teva's Agreement to: (i) Drop Its Counterclaims Against Novo's '833 and Wrongfully Listed Device Patents; and (ii) Delay Its Generic Victoza Launch Until June 2024.**

99.     Just minutes before the start of the March 2019 Victoza trial that threatened to expose the '833 and '893 patents as invalid and/or not infringed – and thereby (i) pave the way for generic competition to start by February 23, 2023; and (ii) limit, if not completely negate, Novo's ability to wield the '833 and '893 patents against other would-be generic competitors to

---

[15] The remaining device patent Novo asserted, the '956 "Dose Setting Limiter" patent, expired in 2021 before the active ingredient patents expired and so could not block generic competition beyond the term of those active ingredient patents.

delay competition and further move prescriptions away from Victoza to Ozempic – Novo paid
Teva to settle the case, avoid adjudication of these two patents, and agree to delay the launch of
generic Victoza by 16 months (from February 2023 to June 2024).

100.    Specifically, on March 18, 2019, Novo reported to the district court that it had
settled with Teva. The parties then presented the court with a "Stipulated Consent Judgment and
Injunction" which the court then entered.

101.    This Consent Judgment confirmed that the parties had entered a "negotiated
settlement of this action," the terms of which were set forth in the parties' "Confidential
Settlement and License Agreement."

102.    The Consent Judgment goes on to state that except as expressly licensed and to
the extent Novo's patents "are not held invalid or unenforceable" Teva's sale of its generic
Victoza product at any time prior to expiration of any of the unexpired patents Novo sued on
(listed above in Table 2) would constitute infringement. The Consent Judgment then enjoins
Teva, "except as expressly licensed" by Novo, from making, selling, or profiting from its generic
Victoza product at any time prior to the expiration of all the patents it sued on, plus the recently
issued '659 "Liraglutide in Cardiovascular Conditions" patent with a 2037 expiry that Novo
obtained and listed in the Orange Book in 2018, but which, until this Consent Judgment, had not
even been asserted by Novo in the litigation.[16]

103.    Notwithstanding that this stipulated confession of infringement contradicts Teva's
prior sworn Paragraph IV certifications, *Novo* expressly "acknowledged" in the Consent

---

[16] The lack of Paragraph IV litigation on the '659 patent and the terms of the Consent
Judgment indicate that Teva responded to 2018 Novo's listing of the '659 patent in the Orange
Book with a little viii statement carve-out, meaning that the '659 patent would not have
otherwise prevented Teva from launching generic Victoza upon obtaining FDA approval.

Judgment that **Teva** is nevertheless "entitled to maintain its Paragraph IV certification[s]," including with respect to Novo's otherwise non-infringed and/or invalid '833 patent and its wrongfully listed device patents (the '956 and '893 patents, identified in Table 2 above). Maintenance of Teva's first-filer exclusivity on the basis of its Paragraph IV certifications to those patents, particularly the '833 patent and the wrongfully listed device patents with later expiry dates, was critical to Novo's scheme. So long as Novo could avoid a non-infringement or invalidity judgment on the '833 and the later-expiring device patents, it could park Teva's related first-filer exclusivity to prevent the FDA from approving any other generic version of Victoza prior to the 181st day after Novo's paid-for delayed Teva June 2024 generic Victoza launch.

104.    The specific terms of Novo's Confidential Settlement and License Agreement with Teva have never been publicly disclosed, even in redacted form.

105.    Novo's related contemporaneous 6-K SEC filing reported that: "Teva is licensed to launch a generic version of Victoza as of 22 December 2023. . . . If Novo Nordisk is granted six months pediatric extension for Victoza®, all above-mentioned timelines will be extended by six months. All other terms of the agreement are confidential."[17]

106.    In May 2019, roughly two months later, the FDA granted Novo pediatric exclusivity, thereby moving Teva's paid-for delayed generic Victoza launch date later in time by six months to June 22, 2024.

107.    On June 24, 2024, Teva launched generic Victoza, but not under its ANDA.

---

[17] Novo's bargaining for additional generic delay predicated on exclusivity it did not have at the time is itself an antitrust violation under *Brulote v. Thys Company*, 379 U.S. 29, 32 (1964) ("[W]hatever the legal device employed a projection of the patent monopoly after the patent expires is not enforceable."). In 2015, the Supreme Court was asked to overrule but instead reaffirmed *Brulote*: "A court need only ask whether a licensing agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 459 (2015).

Instead, Teva launched a generic Victoza under Novo's NDA as per Novo's reverse payment terms.

108.    Notably, for the entirety of the 180 days that followed its launch of the Victoza AG, Teva did not face pricing competition from any other generic, including any other Victoza AG. Novo allowed Teva to launch a generic as part of their agreement, but instead of two generics on the market — Teva's and a competing AG from Novo — there was just one: Teva's under Novo's NDA. In other words, the agreement between Novo and Teva allocated to Teva all generic Victoza sales for at least the first 180 days following generic entry.

109.    Novo's exclusive generic arrangement with Teva compensated Teva just like a garden-variety "no-AG" agreement would. A no-AG agreement involves a promise by the brand not to launch an authorized generic during the generic's first-to-file 180-day exclusivity period, so that the generic can take all generic sales and reap the benefit of sole-generic supplier pricing during its exclusivity period, when it otherwise would have to split generic sales 50-50 and face steep pricing competition from a competing authorized generic. No-AG agreements made in connection with the settlement of Paragraph IV Hatch-Waxman litigation have consistently been held to constitute unlawful reverse payments because they transfer value constituting a "large, unjustified" payment to the generic far exceeding the brand's avoided litigation costs.

110.    Here, Teva's launch of generic Victoza under Novo's NDA triggered its first-to-file 180-day exclusivity period during which the FDA could not grant final approval to any other Victoza ANDA. Had it not induced Teva to delay Victoza generic entry in exchange for allocating to Teva 100% of generic sales during the first-filer 180-day exclusivity period, Novo would have had the ability and the economic incentives to launch and/or license its own generic during Teva's first-to-file 180-day exclusivity period. Novo's agreements and actions instead

provided Teva with 180 days free from any generic competition and thereby ceded to Teva 100%
of the generic sales for those 180 days, just as certainly as a traditional no-AG agreement would.

111.    Where an authorized generic competes with an ANDA generic during the first-
filer's 180 days of marketing exclusivity, the authorized generic typically captures approximately
50% of the generic unit sales during the first 180 days of generic marketing. Thus, Novo's
allocating to Teva 100% of all generic sales for those 180 days constituted a very large and
unjustified payment to Teva, which induced Teva to delay launching generic Victoza.

112.    Specifically, for the calendar year before Novo and Teva entered into the
unlawful reverse payment (the 12 months ending December 31, 2018), U.S. sales of Victoza
were approximately $5.377 billion. Thus, at that time, Novo and Teva would value six months of
brand sales at approximately $2.69 billion (half of Novo's $5.377 billion in annual Victoza
sales).

113.    As is common in the pharmaceutical industry, the generic is expected to take 80%
(or more) of the brand sales over the first six months following generic entry. Thus,
approximately $2.152 billion worth of brand sales would be converted to the generic [$2.69
billion * 80%] during the period of Teva's 180-day exclusivity. As is also common, with only
one generic on the market, the generic is typically priced at about 70% of the brand, which
would result in generic sales of approximately $1.506 billion [$2.152 billion * 70%]. Thus,
generic Victoza sales revenue that would have reasonably been anticipated by a generic
manufacturer in Teva's position during the 180-day exclusivity period without competition from
another AG would be approximately $1.506 billion.

114.    Those expectations would have differed dramatically if Novo had not granted
Teva an exclusive generic license and instead launched an authorized generic to compete with

Teva's ANDA generic during Teva's 180 days of exclusivity. According to an FDA study of the effects of additional generic competitors on generic price, the entry of a second generic drives the average generic price down to 56% of the brand price.[18] Thus, while the generics would still take 80% of six months of brand sales, or $2.152 billion, the generic sales value would drop to $1.205 billion ($2.152 billion * 56%). And it would reasonably be expected that those sales would be split evenly (50% / 50%) between Teva's ANDA and Novo's authorized generic.[19] Thus, without the no-AG promise or comparable arrangement, a generic manufacturer in Teva's position would expect its sales of generic Victoza during the first six months to be approximately $603 million ($1.205 billion * 50%).

115.    As a result, the expected value at the time of the reverse payment agreement to Teva of the no-AG provision versus facing competition from an additional generic would have been as much as approximately $903 million, the difference between the amount one would reasonably expect to earn as the only generic seller on the market for 180 days following launch and the amount reasonably expected in the absence of competition from an AG during this 180-day period [$1.506 billion - $603 million]. Thus, Novo's agreement to Teva not to launch a competing generic amounted to a payment to Teva in the range of $903 million. The value transferred by this payment was tantamount to Novo paying Teva $903 million in cash in

---

[18] FDA, Generic Competition and Drug Prices (current as of Dec. 3, 2020), https://www.fda.gov/about-fda/center-drug-evaluation-and-research/generic-competition-and-drug-prices.

[19] FTC, Authorized Generic Drugs at vi (Aug. 2011) (The Federal Trade Commission has concluded that, when free from competition from an authorized generic, "the first-filer's revenue will approximately double" during the first six months of generic competition, compared to what the first filer would make if it faced authorized generic competition.).

exchange for Teva's agreement to delay its generic Victoza launch.[20]

116.    Such payment far exceeded Novo's avoided litigation costs (which at that point were minimal and largely limited to the cost of actually conducting the already-prepared 5-day trial and the cost of prosecuting any related appeal).

117.    On December 23, 2024, the day Teva's 180-day exclusivity period for generic Victoza concluded, the FDA granted final approval to the Victoza ANDA filed by Hikma Pharmaceuticals USA Inc. ("Hikma"), which launched immediately on day 181. The FDA has since granted final approval to other Victoza ANDAs.

**E.    In August 2019, Novo Sued the Second Victoza ANDA Filer, Mylan, Which Responded with Invalidity and Non-Infringement Counterclaims.**

118.    In July 2019, Mylan served Novo with notice of its Paragraph IV-certified Victoza ANDA. This was the second Victoza ANDA that had been filed with the FDA. Mylan, had, by then, already certified under oath to the FDA that the applicable patents Novo listed in the Orange Book for Victoza were invalid, unenforceable, or would not be infringed by Mylan's Victoza ANDA product.

119.    Novo sued Mylan in response to its Paragraph IV notice in the District of Delaware. *See Novo Nordisk Inc. v. Mylan Institutional LLC*, 19-cv-1551 (D. Del.). Novo's suit triggered the automatic stay of FDA approval of Mylan's ANDA for up to 30 months.

120.    In its complaint, Novo asserted against Mylan the same Orange Book-listed patents Novo had asserted against Teva (the '343, '833, '618, '893, and '956 patents), and added the '994 and '869 device patents, both of which were entitled "Needle Mounting System and a

---

[20] In Teva's SEC 10-Q for the quarter ending June 30, 2024 – just one week after Teva's launch of the Victoza AG – Teva identified its Victoza AG sales as material to its attaining over $1 billion in sales revenue that very quarter.

Method for Mounting a Needle Assembly," and had only recently been added to the Orange

Book by Novo.[21] **Table 3** below identifies the patents Novo asserted against Mylan (in order of

expiry, with subsequently issued pediatric exclusivity now added and with Novo's device patents

noted in red and bold type):

**TABLE 3**

| Patent No. | Patent Title | Issue Date | Expiry |
|---|---|---|---|
| **RE41,956** | **Dose Setting Limiter** | **11/23/2010** | **7/21/2021** |
| 8,846,618 | Stable Formulation of Modified GLP-1 | 9/30/2014 | 12/27/2022 |
| 6,268,343 | Derivatives of GLP-1 Analogs | 7/31/2001 | 2/22/2023 |
| **8,579,869** | **Needle Mounting System and a Method for Mounting a Needle Assembly** | **6/30/2023** | **12/30/2023** |
| **7,762,994** | **Needle Mounting System and a Method for Mounting a Needle Assembly** | **5/23/2024** | **11/23/2024** |
| 8,114,833 | Propylene Glycol-Containing Peptide Formulations Which Are Optimal for Production and For Use in Injection Devices | 2/14/2012 | 8/13/2025 |
| **9,265,893** | **Injection Button** | **2/23/2016** | **9/23/2032** |

121.    Just like Teva, Mylan counterclaimed for a declaration that all the Novo patents

asserted against it were either invalid and/or not infringed.

122.    In December 2019, Mylan took an additional step by separately filing an *inter*

*partes* review petition with the Patent Trial and Appeal Board (IPR2020-00324) targeting the

invalidity of the '833 patent on similar bases as those Teva set forth in its evidence-supported

final pretrial order filed just before Novo's March 2019 reverse payment to Teva that delayed

generic Victoza.

123.    The *inter partes* review system was established in 2011 to address a widely held

concern that invalid patents were being issued and enforced to the detriment of both innovation

---

[21] Though Novo listed the '659 patent in the Orange Book a year earlier, it was not included
in its complaint against Mylan, indicating that Mylan's ANDA likely also included a little viii
carve-out for, and would not be blocked by, the '659 patent.

and the economy. It provides for an expedited re-review process before the Patent Office's Patent Trial and Appeals Board to reconsider the Patent and Trademark Office's issuance of a patent as improvidently granted. IPR proceedings have become an exceedingly effective method of challenging improvidently granted patents: a 2017 analysis concluded that only 4% of all petitions end with a final written decision in which all claims are upheld as patentable; and 69% of all petitions that have reached final written decisions have led to findings that all of the claims in the issued patent were invalid or unpatentable from the start.[22]

124.    Under applicable law, 35 U.S.C. § 314(a), the Patent Trial and Appeals Board cannot institute proceedings that could lead to invalidation of the '833 patent unless "there is a reasonable likelihood that the petitioner would prevail."

125.    On June 23, 2020, the Patent Trial and Appeal Board instituted Mylan's IPR petition, finding that Mylan demonstrated a reasonable likelihood of prevailing on at least one claim, and instituted *inter partes* review proceedings on "all of the challenged claims on all asserted grounds." The Patent Trial and Appeal Board then scheduled the matter for a March 2021 IPR trial.

126.    Meanwhile, on July 1, 2020, just one week later in the ongoing Paragraph IV Hatch-Waxman litigation, the parties stipulated to the "WITH PREJUDICE" dismissal of Novo's two added "Needle Mounting System" patents (the '869 and '994 patents).

127.    Two weeks later, on July 15, 2020, Mylan amended its counterclaims in the Paragraph IV Hatch-Waxman litigation to explicitly request an order requiring Novo to delist its two remaining device patents, the '893 "Injection Button" patent and the '956 "Dose Setting

---

[22] Steve Brachmann & Gene Quinn, *Are More than 90 Percent of Patents Challenged at the PTAB Defective?*, IP Watch Dog (June 14, 2017), http://www.ipwatchdog.com/2017/06/14/90-percent-patents-challenged-ptab-defective/id=84343/.

Limiter" patent (the '833 patent being separately attacked via the IPR). Subsequently, in October 2020, the parties stipulated to the "WITH PREJUDICE" dismissal of the '956 patent. The parties thereafter submitted cross-motions for summary judgment on the '893 delisting issue, with the briefing on those issues completed just before the IPR trial was set to start.

128.    With the delisting of the '893 patent imminent due to Mylan's soon-to-be-tried counterclaim and the '833 patent hurtling toward invalidity as a result of the IPR trial, Mylan was poised to clear the way for generic launch to occur upon the February 2023 expiration of the exclusivity associated with Novo's last active ingredient patent by forcing first-filer Teva to either: (a) obtain FDA Final Approval and launch in February 2023; or (b) risk forfeiting its valuable 180-day exclusivity with Mylan potentially launching the first Victoza generic instead.

129.    That Mylan's IPR petition spelled trouble for the '833 patent is corroborated by the fact that Pfizer, Inc., which does not have a Victoza ANDA, filed its own IPR petition (IPR2020-01252) that duplicated Mylan's IPR petition and which the Patent Trial and Appeal Board granted for the same reasons. Pfizer's petition was then joined to Mylan's ongoing IPR proceedings.

**F.    In March 2021, Novo Induced Mylan and Pfizer to Settle to Avoid Adjudication of the '833 Patent and Thereby Preserve Novo's Parked Barrier Preventing the FDA from Approving Any Generic Victoza Before Novo's Paid-For Delayed Teva June 2024 Generic Victoza Launch.**

130.    On March 26, 2021, the day scheduled for Mylan's IPR trial on the '833 patent, Novo reported that a settlement with Mylan had been reached. By April 7, 2021, the parties moved to terminate the IPR, which motion the Board granted shortly thereafter.

131.    On March 31, 2021, a few days after Novo reported its settlement with Mylan to the Patent Trial and Appeal Board, the parties submitted for entry in the Paragraph IV Hatch-Waxman litigation an agreed-upon "Stipulation and Order of Dismissal" that dismissed all

claims, counterclaims, and defense without prejudice. Novo then settled with Pfizer. These outcomes left the '833 patent and wrongfully listed device patents unadjudicated and available for Novo to wield against other would-be generic competitors.

132.    Novo's inducements for and settlement with Mylan preserved Teva's "parked" first-to-file exclusivity as a bottleneck preventing the FDA from approving any other generic Victoza ANDAs before the 181st day after Novo's paid-for delayed Teva June 2024 generic Victoza launch.

133.    The terms of Novo's settlements with Mylan and Pfizer have never been publicly disclosed, even in redacted form.

134.    Novo's SEC 20-F filing contemporaneous with its Mylan and Pfizer settlements disclosed only that Mylan and Pfizer were not expected to launch a generic version of Victoza before Teva's delayed June 2024 entry date (subject, of course, to Teva's 180-day exclusivity), thus confirming, among other things, that Novo's agreements with Mylan and Pfizer preserved Novo's bottleneck blocking the FDA from approving any other Victoza ANDA sooner.

**G.    In March 2022, Novo Induced the Third Victoza ANDA Filer, Sandoz, to Settle, and, in So Doing, Confirmed Its Scheme to Avoid Adjudication of the '833 Patent and Preserve Novo's Parked Barrier Preventing the FDA from Approving Any Generic Victoza Before Teva's Delayed June 2024 Launch.**

135.    In April 2020, Sandoz, having filed its own generic Victoza ANDA, served Novo with notice of its Paragraph IV certification to the same patents Novo has previously asserted against Teva and Mylan, including the '833 and wrongfully listed device patents. This was the third Victoza ANDA that had been filed with the FDA. Novo filed suit against Sandoz in the District of Delaware, triggering the automatic 30-month stay of FDA approval. *See Novo Nordisk Inc. v. Sandoz Inc.*, 20-cv-747 (D. Del.).

136.    As Teva and Mylan had done previously, Sandoz counterclaimed for a

declaration that Novo's asserted patents were invalid and/or not infringed.

137.    At about the time Novo settled the Mylan and Pfizer IPRs, Sandoz started to vigorously challenge Novo's device patents.

138.    In the face of Sandoz's pressure, on June 10, 2021, Novo voluntarily dismissed "WITH PREJUDICE" the claims in its Paragraph IV Hatch Waxman Litigation concerning the two added "Needle Mounting System" device patents it had asserted against Sandoz (the '869 and '994 patents), just as it had with Mylan the year before.

139.    By October 2021, Sandoz sought entry of a court order granting summary judgment on its non-infringement of Novo's '833 patent. In support of that motion, Sandoz explained that Novo did not submit an expert report on the infringement questions and that Novo had confessed that it was no longer pursuing any claim of infringement on the '833 patent. Novo nevertheless refused to agree to the court's entry of a stipulated consent judgment.

140.    For Novo's monopolization scheme to work, Novo needed Sandoz to agree to a mere voluntary dismissal, not a judgment of invalidity or non-infringement. This, however, was unacceptable to Sandoz precisely because, under applicable law, a mere dismissal – unlike a judgment – would leave the '833 patent unadjudicated and thereby keep the Teva first-filer exclusivity bottleneck in place to continue blocking Sandoz from obtaining FDA final approval for its Victoza ANDA. As Sandoz itself explained to the district court: "Under FDA provisions of forfeiture of exclusivity granted to the first ANDA filer [Teva], Sandoz must obtain a judgment . . . to avoid the risks of the FDA refusing to provide final approval of the Sandoz drug product." "Without a judgment, Hatch-Waxman law precludes Sandoz from triggering [the forfeiture provisions] and thus will prevent Sandoz from gaining final approval to enter the generic market for an undetermined time."

141.    Sandoz made clear to the district court that the entry of a ***judgment*** on the '833 patent was vital to its ability to get FDA approval to launch on or soon after the February 2023 expiration of the '343 "active ingredient" patent, and to launch ahead of Teva's delayed June 2024 launch date; that a dismissal alone was insufficient to trigger forfeiture and dislodge the Teva first-filer exclusivity bottleneck that otherwise prevented the FDA from approving Sandoz's Victoza ANDA.

142.    Among other things, this refusal by Novo to enter a judgment by consent, on an issue over which Novo conceded it had no genuine dispute, exposes Novo's intent to maintain Teva's first-filer exclusivity, arising from Novo's use of the '833 and wrongfully listed device patents, as a barrier to the FDA's ability to approve any other Victoza ANDA prior to the 181st day after Teva's delayed June 2024 launch.

143.    By November 15, 2023, Novo stipulated to the dismissal of the active ingredient patents because a "case or controversy no longer exists between the Parties" as to those patents. This left for trial the question of: (i) whether the 2033-expiring '893 "Injection Button" patent was valid and infringed; and (ii) whether the court should enter a judgment of non-infringement on the '833 patent given Novo's concession that it was no longer claiming any infringement of that patent.

144.    Sandoz's final pretrial order submission provided the substantial evidence that made clear that the mechanism involved in Novo's '893 "Injection Button" patent was not novel, and in fact, was lifted from prior art Novo had already commercially deployed in its NovoLog FlexPen over a year before the '893 patent's priority date. Sandoz also identified the numerous ways its pen injection button mechanism differed from the "Injection Button" claimed in the '893 patent.

145.     After the litigation, Novo delisted the '893 patent from the Orange Book.

146.     Sandoz's final pretrial order submission also made clear that it had "the opportunity to sell" its Victoza generic "over a year before the first filer Teva can first sell its drug product," but to do so, it needed a judgment — not a dismissal order — to trigger the 180-day exclusivity forfeiture provisions and dislodge the Teva-exclusivity bottleneck that otherwise would continue to block the FDA from approving the Sandoz ANDA.

147.     On March 22, 2022, rather than conduct the final pretrial conference as scheduled, the parties requested its cancellation and submitted for entry by the district court a "Stipulation and Order of Dismissal" that the court entered the very next day.

148.     This Stipulated Dismissal confirmed that Novo and Sandoz entered into a "Confidential Settlement and License Agreement," and dismissed without prejudice "[a]ll claims, counterclaims, and affirmative defenses concerning the patents-at-issue."

149.     This stipulated dismissal was exactly the outcome Sandoz explained would necessarily preserve the FDA approval bottleneck Novo established by parking and thereafter preserving Teva's 180-day exclusivity established through Teva's Paragraph IV certification on Novo's invalid '833 patent and wrongfully listed device patents.

150.     As with all the prior Victoza settlements, the specific terms of Novo's settlement with Sandoz have never been publicly disclosed, even in redacted form.

151.     Novo's SEC 6-K filing contemporaneous with the Sandoz settlement mirrors Novo's disclosures concerning the Mylan and Pfizer settlements, namely, that as a result of its settlement with Sandoz, Sandoz is licensed to launch a generic version of Victoza no earlier than Teva's delayed June 2024 launch date.

152.     Like Mylan, Sandoz was not a first-filer for Victoza. Sandoz's ANDA launch

date, just like Mylan's and any other non-first-filer ANDA launch, would be conditioned on the expiration of Teva's 180 days of generic market exclusivity.

153.    Novo's SEC disclosure regarding its Sandoz settlement similarly confirmed, among other things, Novo's continued preservation of its FDA generic approval bottleneck blocking the FDA from approving any Victoza ANDA before the 181st day after Teva's delayed June 2024 entry.

**H.    After Sandoz, Novo Relied Exclusively on the '833 and Wrongfully Listed Device Patents to Commence Paragraph IV Hatch-Waxman Litigation, Trigger Automatic 30-Month Stays, and Induce Settlements with All Nine Subsequent Victoza ANDA Filers in Furtherance of Novo's Monopolization Scheme.**

154.    Hikma filed the fourth Victoza ANDA, and served Novo with its Paragraph IV notice in November 2021. Novo responded to that notice with Paragraph IV Hatch-Waxman litigation filed on the basis of only the '833 patent and Novo's wrongfully listed device patents. *See Novo Nordisk Inc. v. Hikma Pharmaceuticals USA Inc.*, 21-cv-1783 (D. Del.). Novo's suit triggered the automatic 30-month stay of the FDA's approval of Hikma's ANDA. That 30-month stay was set to expire on May 12, 2024, roughly a month shy of first-filer Teva's publicly disclosed delayed June 2024 launch date.

155.    **Table 4** below identifies all of the patents Novo asserted against Hikma (in order of expiry, with any pediatric exclusivity added and with Novo's device patents noted in red and bold type):

**TABLE 4**

| Patent No. | Patent Title | Issue Date | Expiry |
|---|---|---|---|
| 8,579,869 | Needle Mounting System and a Method for Mounting a Needle Assembly | 6/30/2023 | 12/30/2023 |
| 7,762,994 | Needle Mounting System and a Method for Mounting a Needle Assembly | 5/23/2024 | 11/23/2024 |

| Patent No. | Patent Title | Issue Date | Expiry |
|---|---|---|---|
| 8,114,833 | Propylene Glycol-Containing Peptide Formulations Which Are Optimal for Production and For Use in Injection Devices | 2/14/2012 | 8/13/2025 |
| 9,265,893 | Injection Button | 2/23/2016 | 9/23/2032 |

156.    Though Hikma counterclaimed for a declaration that the '833 and wrongfully listed device patents Novo asserted against it were invalid and/or not infringed, the triggering of the 30-month stay that would run up to Teva's delayed June 2024 entry date, made it irrational and cost-prohibitive for Hikma to do anything other than settle with Novo on terms that were consistent with Novo's monopolization scheme. It too settled with a stipulated dismissal that left the '833 and device patents unadjudicated and Novo's FDA generic approval barrier in place.

157.    Following Hikma's ANDA filing, each of the following additional eight generic manufacturers filed their own Victoza ANDAs with Paragraph IV certifications: Sun Pharmaceutical Industries, Inc. ("Sun"), Biocon Pharma Ltd. ("Biocon"), Orbicular Pharmaceutical Technologies Pvt. Ltd./Cipla ("Orbicular"), Lupin Ltd. ("Lupin"), ScinoPharm Taiwan Ltd., Meitheal Pharmaceuticals, Inc./Nanjing King Friend ("Meitheal"), Dr. Reddy's Laboratories, Ltd. ("DRL"), and Rio Biopharmaceuticals, Inc. ("Rio"). Novo filed suit against all on the basis of its '833 and wrongfully listed device patents, thereby triggering the automatic 30-month stay as to each. *See Novo Nordisk Inc. v. Sun Pharmaceutical Industries, Inc.*, 22-cv-897 (D. Del.); *Novo Nordisk Inc. v. Biocon Pharma Ltd.*, 22-cv-936 (D. Del.); *Novo Nordisk Inc. v. Orbicular Pharmaceutical Technologies Pvt. Ltd.*, 23-cv-179 (D. Del.); *Novo Nordisk Inc. v. Lupin Ltd.*, 23-cv-4027 (D.N.J.); *Novo Nordisk Inc. v. ScinoPharm Taiwan Ltd.*, 23-cv-20935 (D.N.J.); *Novo Nordisk Inc. v. Meitheal Pharmaceuticals, Inc.*, 23-cv-1195 (D. Del.); *Novo Nordisk Inc. v. Dr. Reddy's Laboratories, Ltd.*, 23-cv-22112 (D.N.J.); *Novo Nordisk Inc. v. Rio Biopharmaceuticals, Inc.*, 24-cv-330 (D.N.J.).

158.    Though nearly all of the above ANDA holders counterclaimed for a declaration of invalidity and/or non-infringement as to all of the patents Novo asserted, with some also explicitly seeking an order directing Novo's delisting of its device patents from the Orange Book, the 30-month stay as to each of these ANDAs ran beyond Teva's delayed June 2024 entry and therefore similarly made it irrational and cost-prohibitive for any of these ANDA holders to do anything other than settle on terms that were consistent with Novo's monopolization scheme. And settled they all did, each with the same kind of voluntary dismissal that left the '833 patent and wrongfully listed device patents all unadjudicated and Novo's FDA generic Victoza approval barrier in place.

I.    **The Current Generic Victoza Liraglutide Market as the Result of Novo's Monopolization Scheme.**

159.    On June 24, 2024, Teva launched a generic Victoza under Novo's NDA pursuant to Novo's reverse payment terms.

160.    On June 21, 2024, the day before Teva's delayed June 22, 2024 licensed entry-date that Novo purchased through its reverse payment, the FDA granted Hikma tentative approval of its generic Victoza ANDA. This meant that Hikma's ANDA, which the FDA had received for review on September 8, 2021 – less than 3 years earlier – met all of the requirements for final approval at that time. Indeed, Hikma's generic Victoza ANDA may have been in an approvable state even longer, with the expected launch by first-filer Teva triggering the FDA to act on Hikma's pending ANDA. The only thing that blocked Hikma's final approval was Teva's 180-day first-filer exclusivity period.

161.    On December 23, 2024, the 180th day after Teva's June 24, 2024 launch of generic Victoza, the FDA granted Hikma final approval of its ANDA, and Hikma launched its generic Victoza that very next day (Day 181). The FDA's final approval of Hikma's generic

Victoza ANDA included the FDA's approval of a little viii statement carve out for the methods-of-use covered by the '659 patent.

162.    Novo's February 5, 2025 SEC 20-F disclosure, its first annual SEC disclosure after Teva's June 24, 2024 authorized generic Victoza launch and the start of generic Victoza sales, confirms that Novo's Victoza settlements with the non-first-filers providing for licenses starting on June 22, 2024, were all conditioned on Teva first completing its first-filer 180-day exclusivity period. Novo, in fact, described exactly that expected outcome in a later SEC filing: "Novo Nordisk has entered into settlement agreements with several manufacturers that have filed ANDAs for Victoza. Consequently, these manufacturers were licensed to launch a generic version of Victoza as of June 22, 2024. [First-filer] Teva launched an authorized generic version of Victoza in June, 2024, [sic] and [non first-filer] Hikma Pharmaceuticals PLC launched its generic liraglutide product in December 2024 [on Day 181]."

163.    On April 2, 2025, the FDA approved Meitheal's generic Victoza ANDA, which Meitheal launched immediately that same day.

164.    On July 22, 2025, the FDA approved Lupin's generic Victoza ANDA, which Lupin subsequently launched.

165.    During the period of delay caused by Novo's monopolization scheme, Novo continued moving prescriptions for Victoza, its first generation GLP-1 drug, to its second generation GLP-1 drug, Ozempic. This second generation GLP-1 has associated ingredient patents with multiple years of unexpired patent life left presumptively protecting Ozempic from generic competition for years to come. Novo therefore used its delay period to squeeze every last dollar out of its final Victoza sales, while simultaneously ramping up and moving Victoza

prescriptions to its newer blockbuster brand Ozempic franchise that, unlike Victoza, did not face imminent generic competition.

166.    Novo knew that when generic Victoza entered the market, it would rapidly take market share through the operation of automatic substitution at the pharmacy counter. Such automatic substitution of lower-priced AB-rated and/or authorized generics is the most efficient means by which generic competition reduces prescription drug prices in the United States.

167.    But generic Victoza can only be automatically substituted for brand Victoza. If a patient has a prescription for Ozempic, the pharmacist cannot automatically substitute a Victoza generic in its place. But, as market participants like Novo understand, once switched to the Victoza generic, market demand is more likely to continue with the generic rather than move to the more-expensive Ozempic brand.

168.    Thus, for each patient Novo was able to switch from Victoza to Ozempic, Novo avoided having its brand product be automatically substituted for a generic at the pharmacy counter and thereby preserved its brand revenues and profits.

169.    It is well known in the pharmaceutical industry that for a brand to successfully move prescriptions from an older generation product to a newer generation product, the brand needs to switch the market sufficiently in advance of generic competition for the older generation products.

170.    Novo bought that time by paying for delayed generic entry. As industry analysts noted in June 2019: "Novo is hoping it can stave off generic competition to Victoza long enough

to build up sales for its next-gen GLP-1, semaglutide. In March [2019], Novo inked a deal with Teva to put off its Victoza generic's launch until [2024]."[23]

171.    Novo's reverse payment agreement with Teva in March 2019 bought Novo 16 extra months beyond February 2023 in which it could carefully plan and orchestrate the switching of the Victoza prescriptions to its second-generation GLP-1 product, Ozempic. During this time, Novo successfully converted significant numbers of Victoza sales to Ozempic.

172.    Novo first introduced Ozempic in 2018. By the time of Ozempic's 2018 introduction, Novo had over $4 billion in Victoza U.S. sales revenue. For 2022, just a couple of months prior to the would-be February 2023 expiration of Victoza's exclusivity, Novo had Victoza U.S. sales of approximately $3.8 billion. By the time of Teva's delayed June 2024 generic Victoza launch, Victoza's sales in the 12 months ending June 2024 had dropped to about $2 billion. Over the same time frame, Ozempic U.S. sales soared. For 2022, Novo had Ozempic U.S. sales of nearly $19 billion (almost double Novo's 2021 Ozempic sales); for 2024, those sales topped $44 billion.

173.    Thus, by the time Victoza generics became available, the prescription base for Victoza had been significantly impaired by Novo's scheme.

174.    Absent Novo's monopolization scheme, there would have been purchasers that switched some portion of their brand Victoza purchases to generic Victoza and would have continued purchasing lower-priced generic Victoza (liraglutide) rather than switching to and paying premium brand pricing for the newer Ozempic semaglutide. As a result of Novo's scheme, however, these would-be generic Victoza liraglutide purchasers were switched to brand

---

[23] Kyle Blankenship, *The Top 20 Drugs by 2018 U.S. Sales* (June 17, 2019), https://www.fiercepharma.com/special-report/top-20-drugs-by-2018-u-s-sales.

Ozempic before automatic generic liraglutide substitution occurred and, as a result, paid and continue to pay premium brand pricing on their Ozempic purchases because there is no generic Ozempic available for those patients to purchase.

175.    This is because, when generic liraglutide became available, there was predictable, effective price competition between Victoza and generic liraglutide at the pharmacy, and resultant switches from Victoza to generic liraglutide. Novo knew that convincing these switched generic liraglutide patients (or their physicians or health insurers) to then switch to Ozempic would be difficult. Novo would need to convince them to leave an effective, inexpensive generic drug and pay significantly more for a brand product.

176.    However, if Novo could manage to persuade patients, physicians, and insurers to switch to Ozempic prior to generic liraglutide entry, then Novo would be able to prevent manufacturers of generic liraglutide from engaging in effective price competition for these patients. This is because generic liraglutide would not be AB-rated to Ozempic, and therefore a pharmacist would not be able to substitute lower-priced generic liraglutide for Ozempic under state substitution laws. Consequently, Novo knew that switching a large portion of the patient base from Victoza to Ozempic prior to the entry of generic liraglutide would — by preventing the application of generic substitution laws — allow Novo to retain a significantly higher portion of its brand GLP-1 franchise sales in the face of generic substitution than it would have otherwise.

**J.    Absent Novo's Monopolization Scheme, Novo Could Not Have Successfully Enforced the '833 or the Device Patents to Block Generic Competition.**

177.    To block generic Victoza from entering the relevant Victoza market in February 2023, Novo, ultimately relied on just two patents: (i) the '833 "For Use in Injection Devices" patent; and (ii) the '893 "Injection Button" patent. Novo dropped all the other device patents

from its cases during the course of its various Paragraph IV Hatch-Waxman litigations. Absent the monopolization scheme, neither the '833 nor the '893 patent could have blocked the start of generic competition in February 2023, once the last exclusivity associated with Novo's last active ingredient patent expired.

### 1.    The '833 "For Use in Injection Devices" Patent Is Invalid and/or Not Infringed.

178.    The '833 patent is invalid or not infringed. As described in its abstract, the '833 patent concerns "pharmaceutical formulations comprising a peptide and propylene glycol, . . . methods of preparing such formulations, . . . uses of such formulations[,] . . . [and] methods for reducing the clogging of injection devices by a peptide formulation." Simplified, the '833 patent claims the unremarkable addition of isotonic agent propylene glycol to a known formulation (*e.g.*, WO/0037098) so that it can be dispensed by, and not clog, the injection pen device.

179.    As Teva made clear in the February 25, 2019 final pretrial order governing the would-be March 2019 Victoza trial, there is nothing novel about the '833 patent. The GLP-1 derivative formulations for Victoza, including the formulation described in the '833 patent itself, were well-known and broadly disclosed prior to the effective filing date of the '833 patent, as was "the use of pharmaceutically-acceptable vehicles, preservatives, isotonic agents, and buffers for such GLP-1 derivatives to maintain stability and solubility," including, specifically, the use of propylene glycol.

180.    Practitioners of ordinary skill in the art would have been motivated to combine these (and potentially, other) prior art references as in the claims of the '833 patent. The '833 patent was therefore at least invalid as anticipated or obvious in light of the prior art.

181.    In addition, Teva (and, later, the other generics) also asserted other invalidity and non-infringement grounds. The '833 patent simply would not have survived the March 2019

Victoza trial, had Novo not paid Teva to drop its challenge to the '833 patent by allocating to Teva 100% of the generic Victoza sales following Novo's paid-for delayed Teva June 2024 generic Victoza launch.

**2.    The '893 "Injection Button" Patent Is Invalid and/or Not Infringed.**

182.    The '893 "Injection Button" patent is also invalid and/or not infringed. GLP-1 agonists, like Victoza (and its AB-rated generic substitutes), are administered by intramuscular injection, and therefore do not require a sophisticated injection mechanism. The specific injection "button" claimed by the '893 patent was unnecessary. Many other options exist in the prior art.

183.    As Teva made clear in the February 25, 2019 final pretrial order governing the would-be March 2019 Victoza trial, the '893 patent was invalid as anticipated or obvious in light of prior art, and, in any event, Teva's Victoza generic product did not infringe the '893 patent because it did not have an "injection button."

184.    Moreover, Novo was only set to assert at trial two dependent claims (Claims 3 and 4) from the '893 patent against Teva, and only under the doctrine of equivalents, rather than literal infringement. This tactic provided Teva with additional legal defenses to infringement— for example, limitations to the scope of the doctrine of equivalents, such as ensnarement. Ensnarement is a doctrine that bars a patent holder from using the doctrine of equivalents to immunize otherwise invalidating prior art.

185.    For example, if Novo proceeded to argue at trial that Teva infringed Claims 3 and/or 4 of the '893 patent under the doctrine of equivalents, such an assertion would expand the scope of the claim to be so broad as to unavoidably include the prior art. Thus, either Teva's Victoza ANDA device does not infringe the '893 patent or the '893 patent is invalid for

ensnaring the prior art. Either way, the '893 patent would not have blocked generic competition. Absent its pay-for-delay deal with Teva, Novo would not have been able to avoid this catch-22.

**K.    Absent Novo's Monopolization Scheme, Unrestrained Generic Victoza Competition Would Have Started as Early as February 23, 2023, the Day After the Exclusivity Associated with Victoza's Last Active Ingredient Patent Expired.**

186.    The '343 patent, the last of Novo's active ingredient patents for Victoza, expired on August 22, 2022. The pediatric exclusivity Novo obtained added another six months, extending the exclusivity for Victoza associated with the '343 patent to February 22, 2023. Once that additional pediatric exclusivity for the last active ingredient patent expired, there was no legitimate basis for Novo to delay the FDA's review and approval of any Victoza ANDAs or otherwise prevent generic competition from starting on February 23, 2023.

187.    In the absence of Novo's scheme, the '833 patent would have been invalidated in 2019 as a result of the March 2019 Victoza trial (and certainly before 2023), and the device patents would not have been listed in the Orange Book.

188.    With the '833 patent eliminated, and the device patents not listed, Novo would not have been able to prevent generic Victoza from entering the market as early as February 23, 2023. At that time, Teva would have obtained FDA approval of its generic Victoza ANDA and launched and, if still eligible, enjoy its 180-days exclusivity or risk forfeiting its first mover advantage to any one of the several secondary Victoza ANDA filers.

189.    Without the '833 patent and/or wrongful device patent listings and related Paragraph IV Hatch-Waxman litigations, there would have been no way for Novo to park and maintain Teva's first-filer 180-day exclusivity as a bar to the FDA's ability to approve any other Victoza ANDA at any time prior to the 181st day after Teva's agreed-upon delayed June 2024 launch.

190.    Teva's first-filer 180-day exclusivity existed as a result of Teva's Paragraph IV certifications to the otherwise non-infringed and/or invalid '833 patent and/or wrongfully listed device patents. Any first-filer 180-day exclusivity that attached to the Paragraph IV certifications Teva made to Novo's properly listed active ingredient patents expired the moment those patents expired. Hence, in the absence of the '833 patent and/or the device patent listings, there would have been no way for Novo to prevent the FDA from reviewing and approving any of the numerous pending ANDAs to permit generic launches as early as February 23, 2023.

191.    And even if the device patents were not improperly listed in the Orange Book by Novo and, therefore, Teva was entitled to first-to-file exclusivity on those patents, Novo's reverse payment to Teva resulted in delayed generic entry, and overcharge damages to Plaintiff and Class Members. Absent that illegal payment, Teva would have either (a) invalidated or been found not to infringe Novo's patents, permitting it to launch upon FDA approval on February 23, 2023 once the last exclusivity associated with the last active ingredient patent expired, or (b) settled its patent litigation with Novo without the illegal payment but with an earlier entry date,[24] allowing for entry in February 2023 or soon thereafter and certainly earlier than June 2024.

192.    Even if the device patents were not improperly listed in the Orange Book, absent Novo's unlawful reverse payment to Teva, any agreement resolving Novo's patent infringement claims would have resulted in far less (or no) delay of Teva's generic Victoza entry, generic competition would have been more robust, and generic prices would have been lower. But for the reverse payment, Teva would have launched its generic version of Victoza following a patent

_____

[24] As the Supreme Court stated, brand and generic companies can settle without reverse payment. "They may, as in other industries, settle in other ways, for example, by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point." *Actavis*, 570 U.S. at 158.

litigation victory as a result of the March 2019 Victoza trial or pursuant to a negotiated earlier entry date as part of an agreement that did not include a reverse payment. At the time of that generic launch, Novo would have competed for generic Victoza sales by immediately launching authorized generic Victoza, competition which would have been enriched soon thereafter by other FDA-approved ANDA generics entering the market.

193.    Novo's monopolization scheme disrupted the Victoza market and the timing that would otherwise apply to generic manufacturers' related ANDA submissions and generic Victoza development efforts.

194.    In the absence of barriers associated with Novo's wrongful conduct alleged herein, generic manufacturers would have ordered themselves around the expectation that the last of the blocking active ingredient patent exclusivities for Victoza would expire on February 22, 2023, and AB-rated generic versions of Victoza could therefore be approved by the FDA and launch as early as February 23, 2023. Even if the device patents were properly listed and Novo and Teva entered into a settlement agreement without any unlawful reverse payment, generic Victoza would have launched earlier than it actually did.

195.    Generic manufacturers typically closely monitor the expiration dates of Orange Book-listed patents and prioritize and time their ANDA submissions accordingly so that they can be first to market upon expiration of the last Orange Book-listed patent. This close monitoring is particularly true for brand drugs, like Victoza, that earn over a billion dollars in annual sales.

196.    For example, Teva has publicly stated that, "[t]o the extent that [it] succeed[s] in being the first to market a generic version of a product . . . [its] sales, profits and profitability can

be substantially increased in the period following the introduction of such product." [25] In an instance where a generic company like Teva is "late to market," it must factor in that, financially, "the value isn't going to be . . . what it would have been" had it launched earlier.[26]

197.    Similarly, the FDA regularly pursues initiatives with "the aim of expediting access to safe and effective medications." In 2022, the Director of the Office of Regulatory Operations within CDER at the FDA noted in an interview that the FDA's work to maximize "use of its generic approval pathway for generic drugs" leads to faster approval times, which "also help many generic drugs gain approval as soon as patent and exclusivity protections expire."[27] This is in keeping with the FDA's view that it "considers first generics to be important to public health, and prioritizes review of [such ANDAs]."[28]

198.    With that market expectation, generic manufacturers, including but not limited to all 12 of the Victoza ANDA filers, would have filed and vigorously pursued their ANDAs timed to obtain FDA final approval by February 23, 2023. Absent the challenged conduct, these manufacturers would have obtained FDA approval and launched earlier than they actually did. Such launches would have begun as early as February 23, 2023, and, even if the device patents

---

[25] Form 10-K, Teva Pharmaceutical Industries Limited Annual Report for the Fiscal Year Ended December 31, 2021 at 28, *available at* https://d1rn0p25nwr6d.cloudfront.net/CIK-0000818686/3618a206-4439-4dd4-9f28-829638e583da.pdf.

[26] *See, e.g.*, Teva Pharmaceutical Industries Q4 2020 Earnings Call Transcript, Feb. 10, 2021, *available at* https://www.fool.com/earnings/call-transcripts/2021/02/10/teva-pharmaceutical-industries-teva-q4-2020-earnin/.

[27] *CDER Conversations: The Generic Drug Approval Process*, U.S. Food & Drug Admin. (Mar. 17, 2022), https://web.archive.org/web/20241220091801/https://www.fda.gov/drugs/cder-conversations/generic-drug-approval-process.

[28] *First Generic Drug Approvals*, U.S. Food & Drug Admin. (Nov. 25, 2024), https://www.fda.gov/drugs/drug-and-biologic-approval-and-ind-activity-reports/first-generic-drug-approvals. In 2020, for instance, FDA approved 72 first generic drugs. *See* https://www.fda.gov/drugs/first-generic-drug-approvals/2020-first-generic-drug-approvals.

were properly listed, no later than 180 days after Teva launched pursuant to a settlement agreement that did not include any payment for delay.

199.    Teva, for example, filed its Victoza ANDA over six years before February 2023. It has not pursued approval of that ANDA as a result of the corruptive effects of Novo's monopolization scheme, including Novo's illegal payment to Teva for the delay. In the absence of such corruptive effects, Teva would have obtained FDA approval on its Victoza ANDA before February 2023.

200.    Even with the delay and FDA approval blockage caused by Novo's monopolization scheme, it took non-first filer Hikma less than three years to get FDA approval on its Victoza ANDA, the first generic Victoza ANDA to launch. It took the FDA roughly 18 months to approve the next-launched, later-filed ANDA (Meitheal) and less than 2 years to approve the next-launched, later-filed ANDA (Lupin). If not Teva, then any one of the numerous other Victoza ANDA filers would have instead raced to be the first generic approved to launch in February 2023, in order to capitalize on that very valuable first-mover advantage.

201.    Under FDA rules and standard practice manuals, in the absence of barriers associated with Novo's wrongful conduct, the Victoza ANDA filers would all have also benefitted from the FDA's priority and/or expedited ANDA review and approval process. Such priority review typically is applied by the FDA to ANDAs for which there are no blocking Orange Book-listed patents and there is no generic yet on the market. When such review "is dependent on the expiration of a patent (*i.e.*, the submission contains a paragraph III certification) . . . OGD and OPQ will seek to complete the review of the [ANDA] in a manner that would permit approval by the last applicable patent expiration date or exclusivity date." *See* FDA Manual of Policies and Procedures 5240.3 Rev. 4, Eff. Nov. 9, 2017 at 4. In other words,

for ANDAs with only Paragraph III certifications (*i.e.*, generic manufacturers looking to market their generic product upon expiration of the brand drug's last patent and facing no other exclusivities barring their entry), the FDA routinely expedites review and provides final approval to the ANDA on or within a few days of the patent's expiration date.

202.    Generic Victoza treats and manages diabetes which is a critical healthcare concern affecting millions of people in the United States, and is the kind of product the FDA would typically prioritize for expedited generic approval.

203.    Absent Defendants' anticompetitive conduct, Teva, if not any one of the numerous other ANDA filers, would have obtained final approval and launched its generic Victoza on, or soon after, February 23, 2023, the day after the last exclusivity attached to Novo's last Victoza active ingredient patent expired.

204.    Even if the device patents were not improperly listed in the Orange Book by Novo, absent the reverse payment, Teva would have obtained FDA approval and launched earlier than it did (as noted above), and thus Teva's 180-day exclusivity periods would have been triggered (and elapsed) earlier, and other generic manufacturers would have been able and motivated to obtain FDA approval and launch earlier than they did.

## VI.    CLASS ALLEGATIONS

205.    Plaintiff brings this action on behalf of itself and, under Fed. R. Civ. P. 23(a) and (b)(3), as representatives of a class of direct purchasers (the "Class") defined as follows:

> All persons who, or entities which, purchased in the United States[29] at any time on or after February 23, 2023 up to the day the anticompetitive effects of Defendants' conduct cease: (i) brand

---

[29] The term "United States" includes all fifty states, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and any other territories or possessions of the United States.

Victoza directly from Novo; or (ii) generic Victoza directly from Teva, Hikma, Meitheal, Lupin, or any other generic Victoza supplier.

Excluded from the Class are Defendants and their respective officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

206.    Members of the Class are so numerous that joinder is impracticable. Further, the Class is readily identifiable from information and records in Defendants' possession.

207.    Plaintiff's claims are typical of those of the Class. All Class Members were damaged by the same unlawful conduct — *i.e.*, they were deprived of earlier and more robust competition from lower-priced generic Victoza as a result of Novo's unlawful conduct and paid artificially inflated prices for brand and generic Victoza.

208.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

209.    Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation, and with particular expertise in pharmaceutical antitrust class actions.

210.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class Members because Novo has acted on grounds generally applicable to the entire Class thereby making overcharge damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' unlawful conduct.

211.    Questions of law and fact common to the Class include:

    i.    whether Novo willfully and unlawfully obtained and/or maintained monopoly power in the Victoza market;

    ii.    whether Novo's scheme to monopolize the Victoza market violated Section 2 of the Sherman Act;

iii.    whether Novo unlawfully listed the device patents in the Orange Book;

iv.    whether Novo could have relied on the Hatch-Waxman regulatory framework without listing in the Orange Book the otherwise non-infringed and/or invalid '833 patent and/or the device patents;

v.    whether Novo paid Teva in 2019 with an unlawful reverse payment in exchange for Teva's agreement to (a) drop its counterclaims against the '833 and device patents, and (b) delay generic entry at least through June 22, 2024;

vi.    whether Novo's conduct thereafter created an FDA approval bottleneck that prevented the FDA from approving any other would-be generic Victoza competitors at any time prior to the 181st day after Teva's delayed entry;

vii.    whether Novo's settlements with the non-first-filers for Victoza preserved and maintained Novo's FDA approval bottleneck;

viii.    when, in the absence of the unlawful conduct alleged herein, generic Victoza would have launched earlier than it actually did;

ix.    whether Novo's and/or Teva's activities substantially affected interstate commerce;

x.    whether, and, if so, to what extent, Novo's conduct caused antitrust injury (*i.e.*, overcharges) to the Plaintiff and the Class; and

xi.    the quantum of aggregate overcharge damages to the Class.

212.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to

59

prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

213.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VII.    MARKET POWER AND DEFINITION

214.    The relevant geographic market is the United States and its territories and possessions.

215.    At all relevant times, Novo's share of the relevant Victoza market was 100%.

216.    At all relevant times, Novo had monopoly power in the Victoza market, consisting of Victoza and its AB-rated generic equivalents. Novo had the power to maintain the price of Victoza at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Victoza, with the exception of its respective AB-rated generic counterparts. This market power may be shown directly, and therefore no relevant market needs to be defined.

217.    Manufacturers attempt to differentiate brand name drugs like Victoza based on features and benefits (including safety and efficacy), and not based on price. Doctors and patients are generally price-insensitive when prescribing and taking prescription drugs like Victoza. This is due in part to the presence of insurance that bears much of the cost of prescriptions and other institutional features of the pharmaceutical marketplace. Different patients may respond differently to different drugs and even drugs within its same therapeutic class do not constrain the price of Victoza.

218.    Other products are not practical substitutes for Victoza and its respective AB-rated generic substitutes. During the relevant period, other forms of similarly-indicated drug therapies have been freely available, but the presence of these alternatives did not result in lower Victoza prices.

219.    Victoza does not exhibit significant, positive cross-elasticity of demand with respect to price with any other similarly indicated prescription drug. Other therapeutic alternatives may exist (*i.e.*, other, non-liraglutide diabetes control treatments), but none exhibit significant cross-price elasticity with Victoza and therefore none (other than Victoza's AB-rated generic counterparts) constrain the price of Victoza. The existence of these other products that may be used to treat similar indications did not constrain Novo's ability to raise or maintain Victoza prices without losing substantial sales, and therefore those other drug products are not in the same relevant antitrust market as Victoza. Therapeutic alternatives, to the extent existent, are not the same as economic alternatives.

220.    Functional similarities between Victoza and other similarly-indicated medicines, other than AB-rated generic Victoza equivalents, are insufficient to permit inclusion of those other molecules in the relevant market for Victoza. To be an economic substitute for antitrust purposes, a functionally similar product must also exert sufficient pressure on the prices and sales of another product, so that the price of that product cannot be maintained above levels that would otherwise be maintained in a competitive market. No other similarly-indicated medication (except for AB-rated generic versions of Victoza) will take away sufficient sales of Victoza to prevent Novo from raising or maintaining the price of Victoza above levels that would otherwise prevail in a competitive market.

221.    Victoza is also not reasonably interchangeable with any products other than its

AB-rated generic counterparts because Victoza has significantly differentiating attributes making it a unique drug product. The FDA does not consider Victoza interchangeable with any other medication other than its AB-rated generic equivalents.

222.    Novo needed to control only Victoza and its AB-rated generic equivalents, and no other products, to maintain the price of Victoza at a supracompetitive level while preserving all or virtually all of its sales. Only the market entry of a competing, AB-rated generic version of Victoza would render Novo unable to maintain its monopoly prices of Victoza without losing substantial sales.

223.    Novo also sold Victoza at prices well in excess of marginal costs, and substantially in excess of the competitive price, and enjoyed high profit margins.

224.    Novo has exercised its power in the relevant Victoza market to exclude and restrict competition to Victoza's AB-rated generic equivalents.

225.    Novo, at all relevant times, enjoyed high barriers to entry with respect to competition in the relevant Victoza market due, in large part, to legally and illegally created patent protections, legally and illegally created regulatory bars to FDA approval of generic competitors, and high costs of entry and expansion.

226.    To the extent Plaintiff is legally required to prove monopoly power through circumstantial evidence by first defining a relevant product market, Plaintiff alleges a distinct relevant product market at issue here: Victoza and its AB-rated generic equivalents. The geographic market is the United States, including its territories and possessions. During the period relevant to this case, Novo has been able to profitably maintain the price of Victoza well above competitive levels.

## VIII.   MARKET EFFECTS AND CLASS DAMAGES

227.    But for the anticompetitive conduct alleged herein, multiple generic

manufacturers would have entered with their generic Victoza products starting on, or soon after, February 23, 2023, when, but for Novo monopolization scheme, the FDA would have likely started approving ANDAs for generic versions of Victoza for immediate market entry.

228.    Instead, Novo willfully and unlawfully maintained its monopoly power in the market for Victoza and excluded competition through its monopolization scheme. The scheme delayed generic competition and carried out its anticompetitive effect of maintaining supracompetitive prices for Victoza and its respective AB-rated generic counterparts. Novo implemented its monopolization scheme by, among other things: (i) wrongfully listing device patents in the Orange Book for Victoza; (ii) asserting Paragraph IV Hatch-Waxman litigation on the basis of the '833 and/or wrongfully listed device patents to trigger the 30-month stay of FDA approval of generic Victoza; (iii) settling its related Paragraph IV Hatch-Waxman litigation with Teva, the first generic ANDA filer for Victoza, with an unlawful reverse payment that compensated Teva with generic Victoza exclusivity for the first 180-days following the launch of generic Victoza in exchange for Teva's agreement to dismiss its counterclaims against Novo's '833 and device patents and delay its launch of generic Victoza until June 2024; (iv) parking and maintaining Teva's first-filer exclusivity as a barrier preventing the FDA from approving any other Victoza ANDA generic prior to the 181st day after Teva's delayed June 2024 generic launch; and (v) inducing other Victoza ANDA filers to settle on terms that avoided adjudication of the '833 and wrongfully listed device patents and thereby preserved Novo's FDA approval barrier that prevented the FDA from approving any other generic Victoza ANDA prior to the 181st day after Teva's delayed June 2024 generic launch. These acts, individually and/or in combination, were anticompetitive.

229.    If Novo had not listed the device patents in the Orange Book, and filed related

Paragraph IV Hatch-Waxman litigation on the basis of those wrongfully listed patents and the otherwise non-infringed and/or invalid '833 patent, Novo could not have abused the Hatch-Waxman framework, including through its reverse payment to Teva, as a vehicle to delay generic competition to Victoza beyond the February 22, 2023 expiration of the exclusivity associated with Novo's last active ingredient patent for Victoza.

230.    And even if the device patents were not improperly listed in the Orange Book for Victoza, Teva would have entered the market for Victoza on or about February 23, 2023 because it would have: (i) defeated both the '833 and '893 patents as invalid and/or not infringed as a result of the March 2019 Victoza trial; or (ii) entered into a settlement agreement without the unlawful reverse payment that included an agreed-entry date after February 23, 2023 but well before June 2024. Teva's generic Victoza entry would have been joined with an AG and followed 180 days later by other FDA-approved generic versions of Victoza.

231.    Novo's monopolization scheme further allowed Novo to make Ozempic sales that would have otherwise gone to lower-priced generic Victoza because, in the but-for world, volume would have shifted rapidly from brand Victoza to its AB-rated generics beginning on or about February 23, 2023 due to the operation of state automatic substitution laws. As a result of Novo's scheme, however, many would-be generic Victoza purchasers were instead switched to Ozempic before Victoza automatic substitution occurred, and, as a result, paid and continue to pay premium brand pricing because there is no generic Ozempic available for purchase.

232.    Novo's monopolization scheme had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Victoza from generic competition. Defendants' actions allowed Novo to maintain its monopoly and exclude competition in the market for Victoza and its AB-rated generic equivalents, effectively

preserving that market solely for the benefit of Novo's monopoly profits.

233.    Novo's monopolization scheme has delayed, prevented, and impeded the efficient sale of and competition from AB-rated generic Victoza in the United States and unlawfully enabled Novo to sell brand Victoza without generic competition and thus, at artificially inflated prices.

234.    Novo's monopolization scheme also had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Teva's generic Victoza from competition from other generics for the first 180-days following Novo's paid-for delayed Teva June 2024 generic Victoza launch. Defendants' actions made Teva the exclusive seller of generic Victoza for the first 180-days following its delayed June 2024 launch, enabling Teva to charge supracompetitive prices during that time.

235.    Novo's monopolization scheme has delayed, prevented, and impeded the efficient sale of and competition from AB-rated generic Victoza in the United States and unlawfully enabled Teva to sell generic Victoza without generic competition for 180-days and thus, at artificially inflated prices.

236.    Defendants' unlawful conduct that delayed the introduction of generic Victoza has caused Plaintiff and Class Members to pay more they would have paid for brand and generic Victoza, absent such conduct, and to purchase higher priced brand Victoza instead of its lower-priced AB-rated generic equivalents.

237.    Typically, generic drugs are initially priced significantly below the corresponding brand drug to which they are AB-rated. As a result, upon generic entry, nearly all brand drug purchases are rapidly substituted with their generic equivalents. As more generic manufacturers enter the market, prices for generic versions of the drug predictably plunge even further due to

competition among the generic manufacturers, and, correspondingly, the brand drug loses even more of its market share to the generic versions of the drug.

238.    This price competition enables all purchasers of the brand drug to: (a) purchase generic equivalents of the brand drug at substantially lower prices than the brand; and (b) purchase generic equivalents of the brand drug at a lower price, sooner. Consequently, brand manufacturers have a keen financial interest in delaying and impairing generic competition, and purchasers experience substantial cost inflation from that delay and impairment.

239.    But for Novo's monopolization scheme, Plaintiff and Class Members would have paid less by: (a) substituting purchases of lower-priced AB-rated generic Victoza for their purchases of more-expensive brand Victoza; and (b) purchasing generic Victoza at lower prices sooner.

240.    During the delay in the onset of generic competition caused by Novo's challenged conduct, Novo also moved prescriptions from its first generation GLP-1 product, Victoza, to its second generation GLP-1 product, Ozempic. As a result of that market switch, patients who otherwise would have been moved to and stayed with generic Victoza were instead moved to and paid for brand Ozempic. Ozempic does not have any AB-rated generic alternatives and therefore, unlike Victoza, faces no generic pricing constraint.

241.    Novo's anticompetitive conduct, which delayed the introduction into the U.S. marketplace of any AB-rated generic version of Victoza, also caused Plaintiff and Class Members to pay for the more-expensive brand Ozempic when, in the absence of the Novo's monopolization scheme, Plaintiff and Class Members would have instead purchased lower-priced generic Victoza to satisfy the demand of patients who (a) would have been automatically converted by state substitution laws from Victoza to its AB-rated generic equivalent, and

thereafter (b) would not have switched to the more expensive brand Ozempic.

242.    Moreover, due to Defendants' anticompetitive conduct, other generic manufacturers were discouraged from and/or delayed in bringing generic versions of Victoza to market sooner.

## IX.    ANTITRUST IMPACT

243.    During the relevant period, Plaintiff and members of the Class purchased substantial amounts of: (i) Victoza directly from Novo; and/or (ii) generic Victoza directly from Teva and/or other generic Victoza suppliers. As a result of Novo's unlawful monopolization scheme, Plaintiff and Class Members were compelled to pay, and did pay, artificially inflated prices for brand and generic Victoza, as well as for Ozempic. Those prices were substantially greater than the prices that Plaintiff and Class Members would have paid absent the illegal conduct alleged herein, because the prices of these brand and generic drugs were artificially inflated during the period of delay.

244.    As a consequence, Plaintiff and Class Members have sustained and continue to sustain substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

## X.    EFFECT ON INTERSTATE COMMERCE

245.    At all material times, Victoza and Ozempic manufactured and sold by Novo, and generic Victoza sold by Teva, were shipped across state lines and sold to customers located outside the states of manufacture.

246.    During the relevant time period, in connection with the purchase and sale of brand Victoza and Ozempic, and the purchase and sale of generic Victoza, monies as well as contracts,

bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

247.    During the relevant time period, various devices were used to effectuate the illegal acts alleged herein, including the U.S. mail, interstate and foreign travel, and interstate and foreign telephone commerce. Defendants' activities were within the flow of, and have substantially affected, interstate commerce.

## XI.    CLAIM FOR RELIEF

## COUNT I: 15 U.S.C. § 2 MONOPOLIZATION AND MONOPOLISTIC SCHEME

248.    Plaintiff hereby incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

249.    Plaintiff and Class Members have been injured in their business or property by the violation of 15 U.S.C. § 2. Plaintiff and Class Members' injury consists of having paid higher prices for their: (i) brand and generic Victoza liraglutide injection requirements than they would have paid in the absence of the violation; and (ii) brand Ozempic semaglutide injections that, but for Novo's monopolization scheme, would have been purchases of lower-priced generic Victoza liraglutide injections. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the Novo's conduct unlawful. Plaintiff and Class Members are direct purchasers and therefore the proper parties to bring a case concerning this conduct.

250.    From the launch of Victoza in 2010 through June 24, 2024, Novo possessed monopoly power in the relevant Victoza market, consisting of Victoza and its AB-rated generic equivalents in the United States. But for Defendants' unlawful conduct, as alleged herein, Novo should have lost its monopoly power on February 22, 2023 and in any event well before June 24, 2024.

251.    As described above, from February 23, 2023 through the June 24, 2024 launch of generic Victoza, Novo has unlawfully possessed monopoly power in the relevant Victoza market in the United States. During the relevant time period, no other manufacturer sold a competing, AB-rated generic Victoza product in the United States.

252.    Novo has willfully and unlawfully maintained its monopoly power in the Victoza market from February 2023 through at least June 24, 2024, not as a result of providing a superior product, business acumen, or historical accident but by instead engaging in a monopolization scheme to keep AB-rated generic Victoza from entering the relevant market. Novo knowingly and intentionally engaged in an anticompetitive, overall scheme to maintain its Victoza monopoly power, the components of which scheme either standing alone or in combination (in whole or in part) were designed to, and, in fact, have delayed the launch of generic versions of Victoza. This scheme included:

- Novo's wrongful listing of numerous patents in the Orange Book as covering the drug product, composition, or method-of-use for Victoza, when such patents were device patents ineligible for such listing, in order to set the stage for Novo's abuse of the Hatch-Waxman regulatory process as the means to delay generic competition to Victoza beyond the February 22, 2023 expiration of the exclusivity associated with the last of Novo's active ingredient patents for Victoza;

- Novo's institution of Paragraph IV Hatch-Waxman litigation on the basis of its non-infringed and/or invalid '833 and/or wrongfully listed device patents to, among other things, trigger the automatic 30-month stay of FDA approval of generic Victoza and then induce settlements with the would-be generic Victoza competitors on terms that preserved and/or furthered Novo's monopolization scheme;

- Novo's March 2019 settlement of its Paragraph IV Hatch-Waxman litigation with Teva, the first Victoza generic ANDA filer, with an unlawful reverse payment that compensated Teva by allocating to Teva all generic Victoza sales for the first 180-days in exchange for Teva's agreement to: (i) dismiss its counterclaims against Novo's '833 and wrongfully listed device patents; and (ii) delay the launch of generic Victoza until June 2024;

- Novo's parking and maintenance of Teva's first-filer exclusivity for generic Victoza as a barrier preventing the FDA from approving any other Victoza

ANDA generic prior to the 181st day after Teva's delayed June 2024 launch of generic Victoza; and

- Novo's inducing other Victoza ANDA filers to settle their Paragraph IV Hatch-Waxman litigations on terms that avoided the court's entry of an invalidity and/or non-infringement judgment on the '833 and wrongfully listed device patents and thereby preserved Novo's parked barrier to any FDA generic Victoza approvals prior to the 181st day after Teva's delayed June 2024 launch.

253.    Novo's conduct was anticompetitive because it did not represent competition on the merits, was intended to and did frustrate competition, prevented Victoza liraglutide injection prices from falling to competitive levels, and was motivated by a desire to disrupt generic competition to Victoza.

254.    By means of this scheme, Novo intentionally and wrongfully maintained monopoly power with respect to Victoza in violation of Section 2 of the Sherman Act. As a result of this unlawful maintenance of monopoly power, Plaintiff and Class Members paid artificially inflated prices for brand and generic Victoza.

255.    Novo knew when it listed the device patents in the Orange Book that such patents were ineligible for such listing.

256.    Novo knew that the FDA did not police Orange Book listings and that Novo could therefore list ineligible device patents in the Orange Book, notwithstanding the wrongfulness of such listing. Novo also knew that the wrongful listing of these device patents in the Orange Book would nevertheless force ANDA applicants to file Paragraph IV certifications that would then provide Novo with the further ability to file Paragraph IV Hatch-Waxman litigation that would, among other things, trigger automatic stays of FDA approval for up to 30 months and provide further opportunity for other anticompetitive actions. And, in the event the '833 patent was invalidated along the way, Novo could continue to rely on its wrongfully listed device patents to initiate Hatch-Waxman litigation to delay the FDA's approval of generic Victoza.

257.    Novo knowingly and intentionally used its '833 and wrongfully listed device patents to institute Hatch-Waxman litigation against its would-be generic Victoza competitors. Novo knew that in the absence of its '833 and wrongfully listed device patents it otherwise had no basis to prevent these would-be generic competitors from obtaining FDA approval and launching upon the February 22, 2023 expiration of the exclusivity associated with the last of Novo's active ingredient patents for Victoza.

258.    The effect of Novo's unlawful monopolization scheme was to artificially extend Victoza exclusivity well beyond the February 22, 2023 expiration of the exclusivity associated with the last of Novo's active ingredient patents for Victoza.

259.    There is no valid procompetitive business justification for Novo's anticompetitive conduct, and to the extent Novo offers one, it is pre-textual and not cognizable. Any procompetitive benefits of Novo conduct do not outweigh its anticompetitive harms. Further, Novo's actions were far broader than necessary to achieve any conceivable procompetitive benefit.

260.    As a direct and proximate result of Novo's unlawful conduct, Plaintiff and Class Members were harmed as alleged herein; have been injured in their business or property; have been forced to pay artificially high, supracompetitive prices for brand and generic Victoza, and for Ozempic that would have otherwise been converted to lower-priced generic Victoza, and were harmed thereby, and are thus entitled to treble damages under the Clayton Act, 15 U.S.C. § 15(a), to remedy the injuries they have suffered from Defendants' violations of Sherman Act § 2, 15 U.S.C. § 2.

## XII.    DEMAND FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully demands that the Court:

i. Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. Rule 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as the named representatives of the Class;

ii. Conduct expedited discovery proceedings leading to a prompt trial on the merits before a jury on all claims and defenses;

iii. Enter judgment against Defendants and in favor of Plaintiff and the Class;

iv. Award damages (*i.e.*, three times overcharges) to the Plaintiff and the Class in an amount to be determined at trial, plus interest in accordance with law;

v. Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

vi. Award such further and additional relief as is necessary to correct for the anticompetitive market effects Defendants unlawful conduct caused and as the Court may deem just and proper under the circumstances.

## XIII.   JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself

and the proposed Class, demands a trial by jury on all issues so triable.

Dated: January 23, 2026

Respectfully submitted,

**J M SMITH CORPORATION
d/b/a SMITH DRUG COMPANY**

By:   _____

One of Its Attorneys

Bruce E. Gerstein
Dan Litvin
**GARWIN GERSTEIN & FISHER LLP**
88 Pine Street, 28th Floor
New York, NY 10005
(212) 398-0055
bgerstein@garwingerstein.com
dlitvin@garwingerstein.com

David F. Sorensen
Caitlin G. Coslett
Andrew Curley
Laurel Boman
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600

Peter Kohn
Joseph Lukens
**FARUQI & FARUQI LLP**
1617 JFK Blvd, Suite 1550
Philadelphia, PA 19103
(215) 277-5770
pkohn@faruqilaw.com
jlukens@faruqilaw.com

Bradley J. Demuth
**FARUQI & FARUQI LLP**
685 Third Avenue
New York, NY 10017
(212) 983-9330
bdemuth@faruqilaw.com

Philadelphia, PA 19103
(215) 875-3000
dsorensen@bergermontague.com
ccoslett@bergermontague.com
acurley@bergermontague.com
lboman@bergermontague.com

Stuart Des Roches
Dan Chiorean
Thomas Maas
Caroline Hoffmann
**ODOM & DES ROCHES LLC**
650 Poydras Street, Suite 2020
New Orleans, LA 70130
(504) 522-0077
stuart@odrlaw.com
dchiorean@ordlaw.com
tmaas@ordlaw.com
choffmann@odrlaw.com

Susan Segura
David C. Raphael
**SMITH SEGURA RAPHAEL &
LEGER LLP**
221 Ansley Blvd.
Alexandria, LA 71303
(318) 445-4480
ssegura@ssrllp.com
draphael@ssrllp.com

Steven L. Bloch
Johnathan Seredynski
**SILVER GOLUB & TEITELL LLP**
One Landmark Square, 15th Floor
Stamford, CT 06901
(203) 325-4491
sbloch@sgtlaw.com
jseredynski@sgtlaw.com

Russell A. Chorush
Christopher M. First
Kyle Ruvolo
**HEIM PAYNE & CHORUSH LLP**
609 Main St., Suite 3200
Houston, TX 77002
(713) 221-2000
rchorush@hpcllp.com
cfirst@hpcllp.com
kruvolo@hpcllp.com

*Counsel for Plaintiff and the Proposed Class*